# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

| | | |
|---|---|---|
| REGENTS OF THE UNIVERSITY OF MINNESOTA, | ) ) ) | Case No.: |
| Plaintiff, | ) ) ) | **COMPLAINT** |
| vs. | ) ) | |
| UNITED STATES OF AMERICA; and E.I. DU PONT DE NEMOURS AND COMPANY, | ) ) ) | |
| Defendants. | ) ) | |

_____

Plaintiff Regents of the University of Minnesota ("University"), for their

Complaint against the United States of America ("United States") and E.I. du Pont de

Nemours and Company ("DuPont"), state and allege as follows:

## NATURE OF THE ACTION

1.      This is a civil action for cost recovery and declaratory relief pursuant to the

Comprehensive Environmental Response, Compensation and Liability Act of 1980

("CERCLA"), as amended, 42 U.S.C. § 9601, *et seq*., and the Minnesota Environmental

Response and Liability Act ("MERLA"), as amended, Minn. Stat. § 115B.01, *et seq.*

2.      The University seeks to recover from the United States and DuPont

(together, "Defendants") its environmental response costs incurred as a result of releases

or threatened releases of hazardous substances on approximately 8,000 acres of land it

owns in Rosemount, Minnesota ("Site"), and a declaratory judgment establishing

Defendants' liability for future response costs relating to the Site.

3.      During World War II, the Site was part of the Gopher Ordnance Works ("GOW"), an approximately 13,600 acre facility that was designed to produce smokeless cannon and rifle powder, oleum and other materials used in the manufacture of smokeless powder.

4.      The GOW was a government-owned, contractor-operated facility, which was owned by the United States and designed, constructed and operated by DuPont.

5.      DuPont constructed the GOW between 1942 and 1945, and produced smokeless powder and related materials from approximately November 1944 until August 1945.

6.      In 1946, the United States declared GOW to be surplus property and later deeded the Site to the University to use in a manner consistent with its educational and research mission.

7.      The University continues to own the Site, which now comprises of the University of Minnesota Outreach, Research and Education Park ("UMore Park"), and Vermillion Highlands, a wildlife management and recreation area that is jointly administered by the University and the Minnesota Department of Natural Resources.

8.       At the direction of the Minnesota Pollution Control Agency ("MPCA"), the University has performed an extensive environmental investigation at a cost in excess of several million dollars to determine the source, nature and extent of releases or threatened releases of hazardous substances at the Site.

9.      These investigations have established that the hazardous substances present at the Site were predominantly disposed or otherwise released to the environment during

2

the construction, operation, decommissioning, dismantling and demolition of GOW by the United States and DuPont.

10.     On information and belief, the MPCA will require cleanup of the identified release or threatened release of hazardous substances to achieve cleanup levels consistent with the planned uses of the Site.

11.     The University is entitled to recover from Defendants the response costs it incurs through the date of a judgment in this matter resulting from the period during which Defendants owned and operated the Site and/or arranged for the treatment or disposal of hazardous substances at the Site.

12.     The University is also entitled to a judgment declaring Defendants' liability for the future environmental response costs to be incurred by the University at the Site.

## **JURISDICTION AND VENUE**

13.     This Court has jurisdiction over the subject matter of this action pursuant to Sections 107(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(b), providing exclusive jurisdiction over controversies arising under CERCLA, and pursuant to 28 U.S.C. § 1331, providing for jurisdiction over controversies involving questions of federal law.

14.     In addition, the Declaratory Judgment Act, 28. U.S.C. §§ 2201, and Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), authorize this Court to grant declaratory relief to the University and against Defendants.

15.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the University's claims under MERLA since the federal and state law claims in this action derive from the same set of facts.

16.     Venue is proper in this District pursuant to Sections 107(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(b), and 28 U.S.C. § 1391(b) and (c), insofar as the claims asserted herein arise in this District, the release or threatened release of hazardous substances occurred at the Site in this District, and Defendants conduct and/or have conducted business in this District.

17.     In light of the exclusive jurisdiction provision of Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), the University, for purposes of this action only, waives its immunity under the Eleventh Amendment with respect to the claims it asserts herein, and with respect to any compulsory counterclaims to the University's claims.  This waiver is limited to the claims in this Complaint and any compulsory counterclaims asserted in this action, and it is not, nor is it intended to be, a waiver for other claims or for any purpose other than this action.  The University expressly reserves its immunity under the Eleventh Amendment for all other claims and cases.

## PARTIES

18.     Plaintiff University is an institution of higher education created by charter and perpetuated by the Constitution of the State of Minnesota, Art. XIII, § 3, and is an instrumentality of the state of Minnesota, having its principal place of business in Minneapolis, Minnesota.

19.     The University is the current owner of the Site.

4

20.     Defendant United States includes all relevant agencies of the federal government, as they are currently or were previously designated, including but not limited to the United States Department of Defense ("DOD"), the United States War Department, the United States Department of the Army, the United States Department of the Air Force ("Air Force"), the United States Department of the Navy ("Navy"), the United States Army Corps of Engineers ("USACE"), the War Assets Administration ("WAA") and all other departments, agencies, and instrumentalities of the federal government.

21.     The United States owned GOW (including the Site) during World War II, at the time hazardous substances were disposed at the Site, and contracted with DuPont to design, construct and operate GOW for the manufacture of smokeless powder and related materials.

22.     The United States oversaw and administered DuPont's contract for GOW.

23.     The United States performed and/or oversaw decommissioning, dismantling and demolition activities at GOW prior to the United States' transfer of title to the Site to the University.

24.     After the United States transferred title to the Site to the University, the Air Force and Navy leased portions of the Site from the University at the time hazardous substances were disposed at the Site.

25.     Through its activities associated with GOW, including overseeing and or performing the design, construction, operation, decommissioning, dismantling and demolishing GOW, and subsequently leasing portions of the Site for use by the Air Force

and Navy, the United States arranged for the treatment and/or disposal of hazardous substances at the Site, resulting in a release or threatened release of hazardous substances to the environment.

26.     Defendant DuPont is a Delaware corporation with its principal place of business in Wilmington, Delaware.

27.     DuPont designed, constructed and operated GOW under a contract with the United States.

28.     Through its activities associated with GOW, including designing, constructing and operating GOW, DuPont arranged for the treatment and/or disposal of hazardous substances at the Site, resulting in a release or threatened release of hazardous substances to the environment.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**A.     The Construction and Operation of Gopher Ordnance Works**

29.     During 1942 and 1943, the United States condemned or acquired easements to approximately 13,600 acres of farm land in and near Rosemount, Minnesota to build GOW.

30.     In 1942, the United States entered into Contract No. W-ORD-642 with DuPont to design, construct and operate GOW on a cost-plus-a-fixed-fee basis.

31.     DuPont constructed GOW between 1942 and 1945.

32.     GOW was designed to include, among other things, six powder production lines (A-B-C and D-E-F), its own set of roads, two coal-fired steam plants (only one of which was fully constructed and placed into operation), railroad track and locomotives, a

wastewater treatment plant, industrial and sanitary sewer systems, trade waste ditches and settling ponds, above- and below-ground water and steam lines, and a fire department, a hospital, and a telephone system, comprising in all approximately 900 structures.

33.     From approximately November 1944 through approximately August 1945, DuPont produced an estimated 29 million pounds of smokeless powder, 80 million pounds of oleum and 51 million pounds of nitric acid at GOW.

34.     DuPont was responsible under its contract with the United States for all aspects of operating GOW, including arranging for treatment and/or disposal of all production and other waste streams generated by GOW.

35.     For example, DuPont designed and operated the "Laminex woodbox sewers" at GOW to collect up to 100,000,000 gallons per day of waste water from the acid/oleum and nitrocellulose production areas, which ultimately discharged to the Vermillion River.

36.     From late 1945 through early 1947, the United States performed and/or oversaw decommissioning, explosives decontamination, dismantling and demolition work at the Site, including burning of explosive-contaminated production buildings and "flashing" over 1,000,000 pounds of smokeless powder at the burning grounds, which had been designed and constructed by DuPont.

37.     By owning and/or operating GOW, and/or arranging for treatment or disposal of GOW-related waste at the Site, Defendants caused the release or threatened release of hazardous substances to the environment.

**B.      The University's Acquisition and Use of the Site**

38.      The United States declared GOW to be surplus property on January 10, 1946.

39.      Approximately 4,000 acres of GOW buffer land that had not been actively used for smokeless powder production were sold back to area farmers; the balance of the GOW land (approximately 8,000 acres) was designated for public sale or other disposal.

40.      On or about June 3, 1946, the University submitted a proposal to WAA requesting transfer of air compressors and other GOW property for aeronautical research.

41.      On or about July 15, 1946, the University submitted an amended proposal to the WAA requesting the transfer of approximately 8,000 acres of GOW and specified buildings and related infrastructure and equipment for educational and research uses.

42.      The University's proposal, which was subject to a 100% public education discount pursuant to the Surplus Property Act of 1944, 50A U.S.C. § 1611, *et seq.*, was approved by the WAA in or about November 1946.

43.      The United States conveyed title to the Site to the University under two Quitclaim Deeds: in the first deed, dated August 1, 1947 (and signed on October 9, 1947) ("1947 Quitclaim Deed"), the Federal Farm Mortgage Corporation conveyed 4,687 acres of property to the University ("1947 Parcel"); in the second deed, dated March 17, 1948 ("1948 Quitclaim Deed"), the WAA conveyed 3,320 acres to the University ("1948 Parcel").

44.     On or about June 27, 1951, the United States recaptured 26.7 acres of the Site and certain improvements, including a steam plant and associated structures ("Steam Plant Parcel"), under a national security clause in the 1948 Quitclaim Deed.

45.     Between 1951 and 1961, the United States cannibalized the buildings and equipment on the Steam Plant Parcel for use at other military installations or sale to the public.

46.     The United States re-conveyed the Steam Plant Parcel back to the University by Quitclaim Deed dated March 29, 1961.

47.     Since its acquisition, the University has used the Site for educational and research purposes and has leased portions of the Site to tenants, including the Air Force and Navy, for military, commercial and agricultural uses.

**C.      Air Force and Navy Leases of Portions of the Site**

48.     From March 14, 1954 through September 30, 1958, the University leased 531 acres of the Site to the Air Force for ammunition storage.

49.     On information and belief, the Air Force engaged in munitions testing and waste disposal at the Site during the lease term, including without limitation disposal of gas cylinders, resulting in a release or a threatened release of hazardous substances to the environment at the Site.

50.     From December 14, 1962 through January 22, 2005, the University leased 18 acres of the Site to the Navy for a Satellite Tracking Station.

51.     On information and belief, activities conducted by the Navy at the Site during the lease term included, without limitation, waste disposal, operation of a firing

range, and maintenance and refueling of vehicles and equipment, resulting in the release or threatened release of hazardous substances to the environment at the Site.

**D.     Evidence of Releases of GOW-Related Hazardous Substances at the Site**

52.     In the mid-1980, the DOD created the Defense Environmental Restoration Program ("DERP") in response to passage by Congress of the Defense Environmental Restoration Act, 10 U.S.C § 2701, *et seq*., which required the military to perform environmental restoration activities at former and current military facilities.

53.     The DERP required the DOD, among other things, to identify and perform environmental restoration activities at properties that were previously owned, leased or otherwise possessed by the United States under the jurisdiction of Secretary of Defense ("Formerly Used Defense Sites" or "FUDS").

54.     The USACE performed an initial inspection of GOW in 1985.

55.     Based upon that inspection, USACE commissioned a Confirmation Study of GOW "to make a preliminary determination of the presence or absence of chemical contamination that may have been caused by Department of Defense-related activities." *Draft Report for Confirmation Study at Former Gopher Ordnance Plant* (Donohue Engineers & Architects, October 1987) ("Draft Confirmation Study").

56.     The testing performed as part of the Draft Confirmation Study identified releases of hazardous substances associated with former DOD activities at GOW.

57.     On information and belief, follow-up inspections conducted by USACE in 1991 and 1993 identified several potential Hazardous, Radioactive, Toxic Waste ("HRTW") FUDS-eligible projects the Site, and recommended further investigation.

58.     In October 1999, the USACE submitted an Inventory Project Report ("INPR") concerning GOW to MPCA, in which USACE acknowledged that the Draft Confirmation Study did not investigate, or under-investigated, several areas of potential concern for HRTW, and that "[t]hese areas require additional study to ensure that no contamination has occurred and to protect DOD interest."

59.     In November 1999, the MPCA provided USACE with written comments to both the Confirmation Study and INPR, and requested that USACE perform a Phase I Environmental Site Assessment for GOW, "to aid in the design of an effect [sic] field program to evaluate potential impacts this FUDS may pose to human health and the environment."

60.     The USACE declined the MPCA's request to perform a Phase I Environmental Site Assessment or fund any further investigation of GOW.

61.     In September 2002, the MPCA, Dakota County and the University approved funding for a Preliminary Environmental Investigation of GOW to determine whether DOD-related activities had caused a release or threatened of hazardous substances to the environment at the Site.

62.     The *Preliminary Environmental Investigation Report* (Peer Engineering, August 2003) identified releases of DOD-related hazardous substances to the environment, including dinitrotoluene ("DNT"), lead and mercury in soil at former GOW operational areas.

63. Despite receiving a copy of the *Preliminary Environmental Investigation Report* from the MCPA, the USACE continued to decline the requests by the MPCA and the University that it perform further investigation at the Site.

64. On February 16, 2005, representatives of the University, Army and USACE met at the office of Congressman John Kline in Washington D.C., during which the Army and USACE agreed to perform a Preliminary Assessment of the portion of the Site that was transferred to the University in 1947 under the 1947 Quitclaim Deed.

65. The USACE's *Preliminary Assessment Report for the 1947 Parcel of GOW* (March 2006) determined, *inter alia*, that GOW waste streams generated from DOD activities conducted within the 1947 Parcel may have contained acids, DNT and diphenylamine ("DPA") used in smokeless powder production, industrial solvents and degreasers used in maintenance, parts cleaning and repairs, polycyclic aromatic hydrocarbons ("PAHs") generated from burning and storing coal for the steam plant, mercury that leaked from trickling filters in the water treatment plant or was released from burning coal, and heavy metals including lead, copper and zinc from metal forming operations in the machinery maintenance shops.

66. The USACE subsequently completed a Preliminary Assessment of the Steam Plant Parcel.

67. In the *Limited Preliminary Assessment Report (Final), Steam Plant and Associated 26.7 Acres and Segments B, C, and D, Former Gopher Ordnance Works* (March 2009), the USACE concluded, *inter alia*, that potential hazards from the period when the Steam Plant Parcel was owned by the United States and operated by DuPont

included chemicals used in treatment of water piped to GOW from the Mississippi River, mercury from burning and storage of coal and from mercury-containing instruments, gauges or switches, industrial solvents and degreasers used during maintenance and cleaning activities, heavy metals from structural maintenance, petroleum from oil storage tanks, PCBs from transformers and demolition debris.

68.     The USACE completed a Focused Site Inspection and Expanded Site Inspection (collectively, "Site Inspection") of the 1947 and Steam Plant Parcels between 2007 and 2009.

69.     The combined results of the Site Inspection are described in the *Expanded Site Inspection Report (Final), Gopher Ordnance Works* (December 2009), which identified releases above screening criteria to soil of heavy metals, PAHs, and PCBs and included a finding that "chemicals are present in the groundwater, surface water, soil, and sediment that exceed their respective HHRA [Human Health Risk Assessment] screening criteria."

70.     In correspondence dated May 28, 2010, the MPCA confirmed that the Site Inspection had "again documented releases of hazardous substances to the environment as a result of GOW operations under …DOD ownership," determined that "additional investigations were warranted" and restated MPCA's "position that a full and complete Remedial Investigation/Feasibility Study is necessary for the entire GOW site."

71.     On August 10, 2010, the USACE responded to MPCA's May 28, 2010 correspondence, refusing MPCA's request to perform a Remedial Investigation of the Site.

13

72.     In 2011, in response to MPCA's continued direction to the USACE and the University that a full Remedial Investigation of the Site was necessary, the University performed an environmental investigation of the eastern two-thirds of UMore Park ("UMore East RI") under a Work Plan, Quality Assurance Project Plan ("QAPP") and Field Sampling Plan ("FSP"), which were approved by the MPCA after a public meeting, notice and comment.

73.     The UMore East RI investigated 71 GOW and post-GOW Sites of Concern ("SOCs"), and included the collection of approximately 578 soil samples from test trenches, soil borings, surface soil and sewer sampling locations, groundwater monitoring from existing and newly installed monitoring wells, completion of two geophysical investigations, and televising selected reaches of the GOW Laminex woodbox sewers.

74.     The *Remedial Investigation Report, UMore East* (Barr Engineering, February 2012) documents releases and threatened releases of hazardous substances from GOW activities, including PAHs, lead, mercury and PCBS, in 39 of the 71 investigated SOCs.

75.     On November 5, 2013, the MPCA issued Commissioner's Notice Letters to the USACE and the University, identifying them as "responsible persons" under MERLA for releases or threatened releases of hazardous substances at the Site, and directing that they complete the Remedial Investigation of the Site or face enforcement action.

76.     On November 14, 2014, the MPCA issued a Commissioner's Notice Letter to DuPont, identifying DuPont as "responsible person" under MERLA for releases or threatened releases of hazardous substances at the Site, and threatening enforcement

action absent a commitment to complete "necessary response actions in a timely

manner…."

77.     DuPont has failed and refused to commit to completing any necessary

response actions at the Site.

78.     In response to the directive by MPCA to the USACE, DuPont and the

University,  the University performed further remedial investigation activities at the Site

in 2016 ("2016 RI"), which cumulatively summarized the results of past investigations of

the Site, and included initial or further investigation of ten SOCs within the Site.

79.     The 2016 RI included collection of approximately 460 additional soil

samples from 76 test trenches, 106 soil borings, 11 hand auger borings and 44 surface

soil and sewer sampling locations, collection of soil gas samples, groundwater

monitoring from existing and newly installed monitoring wells, and video logging

approximately 11,400 feet of the remaining sections of the Laminex Woodbox sewers

that had not previously been investigated during earlier phases of the RI.

80.     The 2016 RI was conducted pursuant to a Work Plan, QAPP and FSP,

which were approved by the MPCA after a public meeting, notice and comment.

81.     The *Remedial Investigation Report, UMore Park/Former Gopher

Ordnance Works* (Barr Engineering, May 2017) documented releases of hazardous

substances at the Site resulting from former GOW activities, including DNT, PAHs, lead,

mercury and PCBs, in nine of the ten SOCs investigated during the 2016 RI phase, and

summarized the results of all prior RI phases and activities at the Site.

82.     To date, the University has incurred in excess of $3 million in environmental investigation and other necessary response costs in connection with the release or threatened release of hazardous substances at the Site, and continues to incur necessary response costs in connection with the release or threatened release of hazardous substances at the Site.

83.     The University has made demand on the United States for reimbursement of its response costs resulting from Defendants' ownership or operation of GOW, or treatment or disposal of hazardous substances at GOW, but has thus far received no reimbursement from the United States.

<u>COUNT I - -</u>
<u>COST RECOVERY UNDER CERCLA § 107(a)</u>
**(United States and DuPont)**

84.     The University realleges and incorporates all statements and allegations contained in the above-numbered paragraphs.

85.     Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), any person who is liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) shall be liable for response costs, including costs of removal or remedial action, incurred at a facility.

86.     The University is the "State" for purposes of recovery of response costs under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

87.     The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

88.     The PAHs, DNT, DPA, PCBs, mercury, lead and other compounds identified as present in soil or other media during investigations conducted at the Site are

"hazardous substances" as defined in Section 101(14) of CERCLA, 42 U.S.C. §

9601(14).

89.     There have been "releases," as defined in Section 101(22) of CERCLA, 42

U.S.C. § 9601(22) of hazardous substances into the environment at the Site.

90.     The United States is a "person" within the meaning of Section 101(21) of

CERCLA, 42 U.S.C. § 9601(21).

91.     The United States is liable under CERCLA to the same extent as any non-

governmental entity, pursuant to Section 120(a) of CERCLA, 42 U.S.C. 9620(a).

92.     The United States is a person who, at the time of disposal of hazardous

substances, owned or operated a facility at which hazardous substances were disposed of,

within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

93.     The United States' oversight, decommissioning, decontamination,

dismantling and demolition activities, and subsequent leasing of portions of the Site for

use by the Air Force and Navy, resulted in the release or threatened release of hazardous

substances to the environment, and consequently, the United States is also a person who

arranged for the treatment or disposal of hazardous substances at a facility within the

meaning of Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

94.     DuPont is a "person" within the meaning of Section 101(21) of CERCLA,

42 U.S.C. § 9601(21).

95.     DuPont is a person who, at the time of disposal of hazardous substances,

owned or operated a facility at which hazardous substances were disposed, within the

meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

96.     DuPont's design, construction and operation of GOW resulted in the release or threatened release of hazardous substances to the environment at the Site, and consequently, DuPont arranged for the disposal and/or treatment of hazardous substances at a facility within the meaning of Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

97.     In performing investigations and related activities at the Site, the University has incurred necessary costs of "response" as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), which substantially comply with the evaluation criteria, public participation and other requirements of the National Contingency Plan, 40 C.F.R. Part 300 (as amended) ("NCP"), and/or are not inconsistent with the NCP.

98.     Defendants are therefore strictly, jointly, and severally liable to the University for the aforesaid response costs pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) in an amount in excess of $75,000, to be determined at trial.

99.     Pursuant to Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4), the University is entitled to recover interest on its response costs.

100.    Pursuant to Section 113(l) of CERCLA, 42 U.S.C. § 9613(l), by letter dated August 11, 2017, the University provided copies of the Complaint in this action to the Attorney General of the United States and the Administrator of the United States Environmental Protection Agency.

## COUNT II- -
## DECLARATORY RELIEF UNDER CERCLA § 113(g)(2)
### (United States and DuPont)

101.    The University realleges and incorporates all statements and allegations contained in the above-numbered paragraphs.

102.    Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), provides that in an initial action for cost recovery brought under Section107(a) of CERCLA, the court shall enter a declaratory judgment on liability that will be binding on any future action for response costs as defined under Sections 101(23) - (25) of CERCLA.

103.    The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that in the case of actual controversy, the court may declare the rights and other legal relations of any interested party seeking such declaration.

104.    Defendants are liable for CERCLA response costs to be incurred in the future as owners/operators of the Site and/or as arrangers for disposal of hazardous substances at the Site.

105.    An actual, present and justiciable controversy exists between the University and Defendants, and each of them, concerning Defendants' obligations to reimburse the University for response costs the University will incur in the future in connection with the release or threatened release of hazardous substances at the Site.

106.    The University is entitled to a declaratory judgment pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), and 28 U.S.C. § 2201, that Defendants, and each of them, are strictly liable, jointly and severally, under CERCLA for future necessary response costs to be incurred by the University in connection with the Site.

19

## <u>COUNT III - -</u>
## <u>COST RECOVERY UNDER MERLA, MINN. STAT §§ 115B.03 AND 115B.04</u>
### (DuPont)

107.    The University realleges and incorporates all statements and allegations contained in the above-numbered paragraphs.

108.    Pursuant to MERLA, any person who is liable under MERLA, Minn. Stat. § 115B.04, subd. 1, shall be strictly liable for reasonable and necessary response costs incurred by the state or a political subdivision and reasonable and necessary removal costs incurred by any person at a facility.

109.    The Site is a "facility" as that term is defined in MERLA, Minn. Stat. § 115B.02, subd. 5.

110.    There has been a "release," as that term is defined in MERLA, Minn. Stat. § 115B.02, subd. 15, of hazardous substances to the environment at the Site.

111.    The PAHs, DNT, DPA, PCBs, mercury, lead and other compounds identified in investigations at the Site are "hazardous substances" as that term is defined in MERLA, Minn. Stat. §§ 115B.02, subd. 8.

112.    DuPont is a "person" as that term is defined in MERLA, Minn. Stat. § 115B.02, subd. 12.

113.    DuPont is a responsible person under MERLA, Minn. Stat. § 115B.03, subd. 1(a)(1), as the operator of the Site at the time "when the hazardous substance…was placed or came to be located in or on the facility…."

114.    DuPont is also a responsible person under MERLA, Minn. Stat. § 115B.03, subd. 2, as a person who selected and arranged for the treatment or disposal of hazardous substances at the Site.

115.    The University has incurred recoverable costs of "response," as that term is defined in MERLA, Minn. Stat. § 115B.02, subd. 18, in connection with the hazardous substances that were released to the environment at the Site.

116.    The response costs incurred by the University are not inconsistent with the criteria in Minn. Rules, Ch. 7044, the Priority Rules adopted by the MPCA pursuant to Minn. Stat. § 115B.17, subd. 13.

117.    For the acts alleged herein, DuPont is strictly, jointly and severally liable to the University pursuant to MERLA, Minn. Stat. §§ 115B.03 and 115B.04 in an amount in excess of $75,000 to be determined at trial.

118.    The University is entitled to an award of its costs, disbursements, reasonable attorneys' and witness fees from DuPont under MERLA, Minn. Stat. § 115B.14.

119.    Pursuant to Minn. Stat. § 549.09 and the Minnesota common law, the University is entitled to recover interest from DuPont on the response costs and other damages for which recovery is sought herein.

## COUNT IV- - 
## DECLARATORY RELIEF UNDER MERLA, MINN. STAT § 115B.11, Subd. 2(b)
### (DuPont)

120.    The University realleges and incorporates all statements and allegations contained in the above-numbered paragraphs.

21

121.    MERLA, Minn. Stat. § 115B.11, subd. (2)(b), provides that the prevailing party shall be entitled to a declaratory judgment of liability for all future reasonable and necessary response costs incurred by that party to respond to the release or threatened release, including costs and expenses under Minn. Stat. § 115B.17, subd. 6.

122.    DuPont is liable for MERLA response costs to be incurred at the Site as an operator of the Site and as an arranger for disposal of hazardous substances at the Site.

123.    An actual, present and justiciable controversy exists between the University and DuPont concerning DuPont's obligation to reimburse the University for reasonable and necessary response costs the University will incur in the future with respect to the release or threatened release of hazardous substances at the Site.

124.    Pursuant to MERLA, Minn. Stat. § 115B.11, subd. 2(b), the University is entitled to a declaratory judgment that DuPont is liable for future reasonable and necessary response costs to be incurred by the University in connection with the Site.

## PRAYER FOR RELIEF

WHEREFORE, the University requests the following relief:

A.    A money judgment in favor of the University and against Defendants, jointly and severally, for the response costs incurred by the University with respect to the Site through the date of the judgment herein;

B.    A judgment declaring that each Defendant is strictly liable for all future response costs incurred by the University with respect to the Site;

C.    An award of prejudgment interest, as allowed by law;

D.    An award of the University's costs and disbursements herein;

22

E.      An award of the University's reasonable attorneys' fees and witness fees

herein; and

F.      Such other and further relief as the Court deems just and equitable.


Dated:  August 11, 2017                        GRAY, PLANT, MOOTY,
                                                 MOOTY & BENNETT, P.A.


                                               By___s/Rick E. Kubler_____
                                               Rick E. Kubler, #190007
                                               Richard C. Landon, #392306
                                               500 IDS Center
                                               80 South Eighth Street
                                               Minneapolis, Minnesota 55402
                                               Telephone:  (612) 632-3224
                                               Rick.Kubler@gpmlaw.com
                                               Richard.Landon@gpmlaw.com

                                               and

                                               UNIVERSITY OF MINNESOTA

                                               Douglas R. Peterson, #14437X
                                               Brian J. Slovut, #236846
                                               Dan Herber, #386402
                                               360 McNamara Alumni Center
                                               200 Oak Street, S.E.
                                               Minneapolis, Minnesota 55455
                                               Telephone:  (612) 624-4100
                                               dougp@umn.edu
                                               slov0002@umn.edu
                                               herb0089@umn.edu


                                               **ATTORNEYS FOR PLAINTIFF REGENTS OF
                                               THE UNIVERSITY OF MINNESOTA**

GP:4838-8272-5450 v1

23