## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Regents of the University of Minnesota,                    Case No. 17-cv-3690 (DSD/ECW)

          Plaintiff,

v.                                                                    **ORDER**

United States of America and
E.I. Du Pont de Nemours and Co.,

          Defendants.

This matter is before the Court on Defendant United States of America's Motion to Compel (Dkt. 160) ("Motion"). Plaintiff Regents of the University of Minnesota (the "University") opposes the Motion. (Dkt. 167.) For the reasons stated forth below, the Motion is denied.

## I.     BACKGROUND

### A.     Factual Background

This is an environmental case in which the University seeks cost recovery and declaratory relief against Defendants United States of America ("the USA") and E.I. du Pont de Nemours and Company ("DuPont") pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA" or the "Act") and against DuPont only pursuant to the Minnesota Environmental Response and Liability Act ("MERLA"). (Dkt. 1 at 16-22.)[1] The University alleges that it incurred

---

[1]     All page number citations are to the CM/ECF pagination unless otherwise noted.

over $3 million in environmental investigation and other response costs "in connection with the release or threatened release of hazardous substances" at a site comprising approximately 8,000 acres of land in Rosemount, Minnesota (the "Site") that was conveyed to the University by the USA via two quitclaim deeds in 1947 and 1948.  (*Id.* ¶¶ 2, 82.)  The University continues to own the Site, which now consists of the University of Minnesota Outreach, Research and Education Park ("UMore Park") and Vermillion Highlands, which is a wildlife management and recreation area jointly administered by the University and the Minnesota Department of Natural Resources.[2]  (*Id.* ¶ 7.)

1.      **The University's Acquisition of the Site**

The Site was a part of a larger portion of land that was owned by the USA and was known as the Gopher Ordnance Works ("GOW").[3]  (*Id.* ¶¶ 3-5, 29.)  In 1942, the USA contracted with DuPont to design, construct, and operate the GOW.  (*Id.* ¶¶ 3-5, 30-32.)  The GOW was thereafter constructed between 1942 and 1945.  (*Id.*)  From approximately November 1944 to August 1945, DuPont produced about "29 million pounds of smokeless powder, 80 million pounds of oleum and 51 million pounds of nitric acid at the GOW."  (*Id.* ¶¶ 32-34.)

On January 10, 1946, the USA declared the GOW to be surplus property and in July 1946, the University submitted a proposal to the War Assets Administration

---

[2]      Certain documents refer to the Site as the University of Minnesota Rosemount Empire property or Rosemount Research Center.  (*E.g.*, Dkt. 164-2 at 6-7.)

[3]      The parties use the terms "Site" and "GOW" interchangeably throughout their briefs (*see generally* Dkts. 163, 167); the Court does the same in this Order.

("WAA") to request a transfer of approximately 8,000 acres of the GOW to the University for educational and research uses. (*Id.* ¶¶ 38-41.) That proposal was made subject to a 100% public education discount under the Surplus Property Act of 1944 and was approved by the WAA in November 1946. (*Id.* ¶ 42.) Title to the Site was then conveyed to the University under two quitclaim deeds: the first deed transferred 4,687 acres of property to the University in 1947 and the second deed transferred 3,320 acres in 1948 (the "1948 Property Transfer"). (*Id.* ¶ 43.) In 1951, the USA "recaptured" a small portion of the Site and certain improvements under a national security clause in the 1948 quitclaim deed, and then reconveyed that parcel back to the University in 1961. (*Id.* ¶¶ 44-46.) The contract and deed for the 1948 Property Transfer contained an indemnification clause that became the subject of the parties' dispute as further discussed in Section I.B.1 ("Indemnification Clause").

## 2.    The USA's Initial Inspections of the Site

In the mid-1980s, the Department of Defense ("DOD") through the Defense Environmental Restoration Program ("DERP") required the U.S. military to perform environmental restoration activities at all military facilities and "identify and perform environmental restoration activities at properties that were previously owned, leased or otherwise possessed by the United States . . ." (described as "Formerly Used Defense Sites" or "FUDS"). (*Id.* ¶¶ 52-53.) As a result, the United States Army Corps of Engineers ("USACE") performed an initial inspection of the GOW in 1985 and thereafter commissioned a confirmation study of the GOW "to make a preliminary determination of the presence or absence of chemical contamination that may have been caused by

Department of Defense-related activities" ("Draft Confirmation Study").  (*Id.* ¶¶ 54-56.) That study identified the releases of hazardous substances from the DOD's former activities at the GOW.  (*Id.*)  The USACE conducted additional follow-up inspections of the GOW in 1991 and again in 1993, and identified "several potential Hazardous, Radioactive, Toxic Waste ('HRTW') FUDS-eligible projects [at] the Site, and recommended further investigation."  (*Id.* ¶ 57.)

### 3. The USACE Informs the Minnesota Pollution Control Agency of the Result of its Initial Inspections

Per a Defense and State Memorandum of Agreement between the DOD and the Minnesota Pollution Control Agency ("MPCA"), the MPCA was to oversee USACE FUDS investigation and remediation activities in Minnesota.  (*See* Dkt. 168-1, Ex. 1.) Accordingly, in October 1999, the USACE submitted an Inventory Project Report ("INPR") concerning the GOW to the MPCA that listed the GOW as a FUDS that needed further work.  (*Id.* at 3; Dkt. 1 ¶ 58.)  The INPR acknowledged that the Draft Confirmation Study did not investigate or under-investigated several areas of the GOW with potential HRTW concerns and that additional study was required to determine potential contaminations.  (Dkt. 1 ¶ 58.)  In response, in November 1999, the MPCA provided written comments on the Draft Confirmation Study and INPR to the USACE and asked the USACE to perform a Phase I Site Assessment of the GOW.  (*Id.* ¶ 59; *see also* Dkt. 168-1, Ex. 1 at 3.)  However, the USACE declined that request.  (Dkt. 1 ¶ 60.)

4.      **The MPCA Contacts the University to Request Information Regarding the GOW and the University Retains Outside Legal Counsel**

On May 31, 2001, the MPCA sent a letter to the University seeking access to information maintained by the University relating to the GOW due to the USACE's identification of the GOW as a FUDS that needed further investigation ("Request for Information"). (Dkt. 168-1, Ex. 1.) In the Request for Information, the MPCA advised the University of the USACE's "attempt to transfer environmental liability" for the GOW to the University based on the Indemnification Clause. (*Id.* at 2; *see also* Dkt. 169 ¶ 7.) The MPCA also noted in the Request for Information that its "focus [was to] mak[e] sure that the USACE fulfills its obligations to investigate the GOW and remediate any releases that may be found." (Dkt. 168-1, Ex. 1 at 2.)

On July 13, 2001, shortly after receiving the Request for Information, the University's Office of General Counsel retained outside environmental counsel, Rick Kubler of Gray, Plant, Mooty, Mooty & Bennett, P.A. (now Lathrop GPM LLP) ("Outside Legal Counsel"), to provide legal advice regarding the MPCA's investigation of environmental issues associated with the GOW. (Dkt. 168 ¶¶ 2, 7; *see also* Dkt. 169 ¶¶ 9-10.)

5.      **The University Retains Peer Environmental & Engineering Resources, Inc. as an Environmental Consultant**

On October 16, 2001, Peer Environmental & Engineering Resources, Inc. ("PEER") provided a proposal to the University to provide environmental consulting services on a confidential basis to the University's Outside Legal Counsel in connection with the GOW. (Dkt. 168-4, Ex. 4 at 1-6.) That proposal noted that PEER's services

were to be contracted through the University's Outside Legal Counsel "which is representing the University on the project, in order to keep the work products and communications produced by PEER confidential." (*Id.* at 2.) The proposal required PEER to complete two tasks: Task I was for PEER to review and evaluate the University's files at the GOW and Task II was for PEER to present information gathered from that review on a base map of the GOW. (*Id.* at 4-5.) The University accepted the proposal on December 9, 2001 (*id.* at 3) and PEER continued to "provide environmental consulting services to assist the University's [O]utside [L]egal [C]ounsel and the Office of the General Counsel in advising the University through approximately early 2007" (Dkt. 169 ¶¶ 12-13).

### a. PEER's Preliminary Environmental Investigation Report

PEER submitted a proposal to the University dated November 6, 2002 to perform a Preliminary Environmental Investigation of the GOW, which the University accepted on November 12, 2002. (*See* Dkt. 168-5, Ex. 5 at 2-6.) Per that proposal, PEER was to complete three tasks: Task I required PEER to "prepare a Work Plan for investigation of key historical GOW operational locations" and "outline the investigation activities to be completed at each location"; Task II required PEER to "conduct environmental monitoring during completion of soil borings at selected locations"; and Task III required PEER to prepare a report summarizing the results of its investigation activities, provide that report to the University's Outside Legal Counsel in draft form for comments, and thereafter issue the final report to the University's Outside Legal Counsel, the MPCA, and Dakota County. (*Id.* at 3-4.)

6

A section of that proposal pertained to fees for PEER's services.  (*Id.* at 4-5.)

Tasks I and III of the Preliminary Environmental Investigation were to be funded by the

University and Task II was to be funded by the MPCA.  (*Id*. at 2-6; *see also* Dkt. 168-6,

Ex. 6 at 2-3 (email correspondence from October 4 to October 10, 2002 between

University personnel and the University's Outside Legal Counsel stating that the "MPCA

[will be] providing funds for the MPCA staff time, sample collection and analysis, [and

the University will be] contributing the work plan and report prep"); Dkt. 168 ¶ 8.)[4]

The report for the Preliminary Environmental Investigation issued on August 19,

2003.  (Dkt. 164-2, Ex. 2 ("Preliminary Environmental Investigation Report").)  The

Preliminary Environmental Investigation Report states that the investigation was

implemented to "evaluate the potential presence of environmental impacts at six primary

areas where former GOW operations occurred" and that "[t]he investigation results will

be used to determine if further investigation and/or possible environmental remediation

related to GOW operations is warranted."  (*Id.* at 6 § 1.0.)  It identified releases of

"hazardous substances to the environment that were associated with the former GOW."

(Dkt. 168 ¶ 9; Dkt. 1 ¶ 62).)

In November 2003, the MPCA submitted the Preliminary Environmental

Investigation Report to the USACE and requested that it complete a full remedial

---

[4]      The Preliminary Environmental Investigation Report notes that funding for
"investigation field activities was provided by the [MPCA] utilizing both State Superfund
resources, and federal resources that were provided by U.S. Environmental Protection
Agency (EPA) through a Cooperative Agreement with the MPCA for the purposes of
conducting investigations at potentially contaminated . . . sites in Minnesota."  (Dkt. 164-
2, Ex. 2 at 6 § 1.0.)

investigation of the GOW.  (Dkt. 168 ¶ 9.)  On March 4, 2004, the USA provided a draft

fact sheet to the MPCA and agreed to complete an investigation of the GOW as outlined

in the fact sheet.  (*See* Dkt. 168-7, Ex. 7 at 2-5; *see also* Dkt. 168 ¶ 9.)  However, shortly

thereafter, USACE personnel corresponded internally regarding the fact sheet (Dkt. 168-

8, Ex. 8 at 2-3) and on September 18, 2004, the USA sent a FUDS eligibility finding

report to the MPCA that stated: "[The Site] is eligible for cleanup under DERP-FUDS

policy.  However, due to the language in the [1948 Property Transfer] Deed, it was

determined that the project is ineligible for inclusion in the DERP-FUDS program" (Dkt.

168-9, Ex. 9 ¶ 2).

### b.   PEER's Phase I Environmental Site Assessment

In May 2006, the University retained PEER to complete a Phase I Environmental

Site Assessment and to develop a scope of work for a Phase II Environmental

Assessment.  (Dkt. 168-12, Ex. 12.)  The contract for the Phase I Environmental Site

Assessment included PEER's service fees.  (*Id.* at 3 ¶ 2-3.)  The addendum to the contract

provides, in pertinent part:

> [PEER] acknowledges that the services it performs under this Agreement are
> provided at the request of, for the benefit of, and to assist, the University's
> legal counsel in rendering legal services and providing confidential legal
> advice to the University.  [PEER] further acknowledges that the services it
> performs under this Agreement are provided in anticipation of potential
> litigation between the University and third parties including, but not limited
> to, federal, state or local regulatory authorities and persons or entities
> potentially responsible for releases of hazardous substances, pollutants or
> contaminants on, under, adjacent to or affecting the [GOW].  [PEER] agrees
> to preserve the confidentiality of all communications with [the] University
> and its legal counsel with respect to the services performed under this
> Agreement, and further agrees that it will not reveal its conclusions,
> assessments, opinions or observations reached or developed under this

8

Agreement to any person or entity without the prior, express, written approval of the University or its legal counsel.

(*Id.* at 11.)

### 6.  The University Submits a Legal Position Paper to the MPCA

In December 2005, the University's Outside Legal Counsel sent a legal position paper to the MPCA regarding the University's understanding and interpretation of the Indemnification Clause.  (Dkt. 168 ¶ 12.)  The position paper set forth the University's factual and legal basis for its position that the Indemnification Clause did not transfer responsibility to the University to investigate and remediate the former GOW.  (*Id.*)

On January 4, 2006, the MPCA sent a letter to the USACE and attached the University's legal position paper.  (Dkt. 168-10, Ex. 10; *see also* Dkt. 168 ¶ 13.)  The MPCA asserted its belief that the USACE was responsible for the GOW under CERCLA and Minnesota law regardless of the Indemnification Clause and stated that "it is the MPCA's position that the [USACE] must fully investigate the nature and extent of contamination to all media associated with all aspects and areas of the GOW operation." (Dkt. 168-10, Ex. 10 at 2-3.)  In response, the USA again informed the USACE by letter dated April 4, 2006 that the property transferred by the 1948 Property Transfer "is not considered to be eligible for FUDS funding."  (Dkt. 168-11, Ex. 11 at 2.)

### 7.  The University Retains Barr Engineering Company as a Consultant

On July 3, 2008, the University entered into a consulting agreement with Barr Engineering Company ("Barr") for Barr to provide environmental consulting services regarding a Draft Final Focused Site Inspection Report of the Site that was authored by Bay West, Inc.  (Dkt. 168-13, Ex. 13 at 1 § 1; Dkt. 163 at 7 (stating the USA retained

third-party engineering firm Bay West); *see also* Dkt. 169 ¶ 14, Dkt. 168 ¶ 16.)  Barr's

consulting agreement with the University stated in pertinent part:

> Nature of Services.  . . . .  The University seeks [Barr's] services in
> anticipation of potential litigation . . . between the University and third
> parties including, but not limited to, federal regulatory authorities.  By
> signing this Agreement, [Barr] acknowledge[s its] understanding that [it is]
> being retained to assist the University in connection with anticipated
> litigation by the University. . . .
>
> Confidentiality.  By entering into this agreement, [Barr] agrees to keep all
> information provided to [it] . . . and other information learned by [it] through
> [its] retention confidential.  By signing this Agreement, you acknowledge
> that materials and information disclosed to you during the course of your
> work on this matter, along with the work you perform, will be confidential
> and proprietary, and subject to the attorney-client and work product
> privileges . . . .

(Dkt. 168-13, Ex. 13 at 1 ¶¶ 1-2.)  The payment terms for Barr's services were attached to

the consulting agreement.  (*Id.* at 5, Ex. B.)

## B.     Procedural Background

### 1.     The Indemnification Clause Relating to the 1948 Property Transfer

Highly relevant to this dispute is the Indemnification Clause.  It appears that the

USA has intended to assert since at least 1999 that the Indemnification Clause extended

to CERCLA-related liabilities.  (*See* Dkt. 168-8, Ex. 8 at 2-3.)  Accordingly, although the

USA determined the GOW was eligible for cleanup under DERPS-FUDS policy, the

USA ultimately took the position that GOW was ineligible for inclusion in the DERP-

FUDS program due to the Indemnification Clause.  (Dkt. 168-9, Ex. 9 at 2.)

Consistent with this position, on April 5, 2018, the USA filed a Motion for Partial

Judgment on the Pleadings seeking an order holding that the University is not entitled to

10

recover its response costs from the USA under CERCLA with respect to the property transferred by the 1948 Property Transfer and that the University is required to indemnify and hold harmless the USA for all of its past, current, and future expenses related to that property resulting from the University's ownership or use of the property and/or the contaminated condition of the property.  (Dkt. 48.)  The University opposed the motion.  (Dkt. 52.)  On July 12, 2018, U.S. District Judge David S. Doty denied the motion.  (Dkt. 57.)  Judge Doty found the Indemnification Clause was ambiguous, particularly in view of the fact that the contracts predated CERCLA by 30 years, and that additional factual development was required.  (Dkt. 57 at 7-8.)

On October 31, 2019, after engaging in some discovery, the USA filed a Motion for Partial Summary Judgment seeking an order that would:

(1) declare[] that the 1948 Quitclaim Deed's indemnification clause covers the University's claims to recover CERCLA response costs related to the 1948 Parcel;

(2) find[] that the University is liable to the United States for all costs the United States has spent defending itself against the claims to recover response costs;

(3) prevent[] the University from recovering from the United States CERCLA response costs related to the 1948 Parcel, to the extent that they relate to contamination from the former GOW; and

(4) order[] the University to indemnify the United States for DuPont's contribution claim and contract claim, to the extent those claims relate to the environmental condition of the 1948 Parcel from the former GOW.

(Dkt. 92 at 1-2.)

Also on October 31, 2019, the University filed a Motion for Partial Summary Judgment as to the USA's breach of contract counterclaim and the USA's affirmative defense relating to the USA's liability for the 1948 Property Transfer. (Dkt. 96.)

On October 14, 2020, Judge Doty denied the USA's motion, granted the University's motion, and found that the Indemnification Clause did not include CERLCA type liabilities. (Dkt. 124 at 13-18, 20.) As a result, Judge Doty dismissed the USA's breach of contract counterclaim and struck the USA's affirmative defense relating its liability for the 1948 Property Transfer. (*Id.* at 20.)

### 2.      The USA's Motion to Compel

The parties continued to engage in discovery, and on August 10, 2021, the USA filed the current Motion to Compel. (Dkt. 160.) Specifically, the USA seeks to compel production of communications and draft reports between the University, the University's Outside Legal Counsel, and the University's environmental consultants, PEER and Barr. (*Id.* at 1; Dkt. 163 at 3.)

On August 10, 2021, this Court held a pre-discovery dispute conference and set the hearing on the Motion for August 30, 2021. (Dkts. 161-162.) At the August 30 hearing and in its brief in support of the Motion, the USA noted that although the USACE had hired two engineering consulting firms (including Bay West) to perform environmental investigations of the GOW, the USA (unlike the University) has not withheld correspondence to and from its engineering consultants. (*See* Dkt. 163 at 24.)

The USA states that the University submitted a privilege log with 4,440 entries dating back to 2002, about two-thirds of which are communications between

representatives of PEER and Barr and the University and/or the University's Outside

Legal Counsel and attachments to those communications, such as draft reports

(collectively, "Documents"). (*Id.* at 5-7.) The USA states that the University has

withheld all of the Documents on the basis of the work-product doctrine, and about 500

of them also on grounds of attorney-client privilege. (*Id.* at 5-6.) The USA argues that

the University has not met its burden of demonstrating that the Documents are protected

by the work-product doctrine and the Documents therefore should be produced. (*Id.* at 3-

4, 10-12.)

       As it relates to its burden argument, the USA contends that the University's

privilege log does not sufficiently demonstrate that the Documents are subject to the

work-product doctrine. (*Id.* at 11.) The USA also argues that the University failed to

meet its burden of showing that the communications with PEER and Barr were made in

anticipation of litigation. (*Id.*) The USA maintains that because the environmental

investigations by PEER and Barr were done for non-litigation purposes, that is "to

evaluate the nature of environmental conditions and whether contamination was present

at the Site, and what cleanup may be needed," the Documents are not protected by the

work-product doctrine. (*Id.* at 10-13.) In support of this argument, the USA states that

none of the final reports for the environmental investigations, including PEER's

Preliminary Environmental Investigation Report from 2003, the report for the

Groundwater Assessment of the Site prepared by Barr in 2009, or the two Remedial

Investigation Reports by Barr in 2011-12 and 2017, indicate that they were prepared in

anticipation of litigation, but instead reference other environmental-related purposes and

objectives.  (*Id.*)  The USA also argues that the deposition testimony of Jim Eidem, a representative of Barr, does not show that the documents prepared by Barr were done in anticipation of litigation.  (*Id.* at 14.)

The USA contends that the University has not provided any evidence to show it anticipated litigation with the MPCA and/or the University in 2003.  (Dkt. 163 at 11.) However, at the August 30 hearing, the USA stated that it does not dispute the University may have contemplated litigation with the USA as early as 2001, but still argues that the Documents at issue were not prepared in anticipation of litigation.

With respect to litigation against the MPCA, according to the USA, while the University may have environmental obligations under Federal and State law as a land owner, steps taken to comply with those laws to avoid potential enforcement actions are not taken in anticipation of litigation.  (Dkt. 163 at 11, 16-21.)   The USA relies on an Eastern District of Michigan case, *Ford Motor Co. v, Michigan Consolidated Gas Co.*, No. 08-CV-13503, 2013 WL 5435184 (E.D. Mich. Sept. 27, 2013), to support this argument and contends that the present case is distinguishable from a case from this District, *Bituminous Casualty Corp. v. Tonka Corp.*, 140 F.R.D. 381 (D. Minn. 1992). (Dkt. 163 at 18-21.)  Ultimately, the USA argues that "undertaking work pursuant to legal obligations—even if the University feared litigation from the MPCA if it didn't live up to its obligations—is not the same as undertaking work in anticipation of litigation." (*Id.* at 19.)

As to anticipated litigation against the USA, the USA argues that the University misconstrues what it means for work to be done in anticipation of litigation.  (*Id.* at 21.)

14

This is because the response costs that the University seeks to recover under CERCLA, that is "costs [the University] incurred to help address environmental contamination," are (according to the USA) "the *exact same* costs [the University] paid for its engineering firms to allegedly help it prepare for litigation," and, according to the reasoning set forth in *Ford Motor*, the University's position that costs incurred to help address environmental contamination are also costs incurred to help prepare for litigation is "absurd[]."  (*Id.* at 21-22.)

The USA also asks the Court to order production of the Documents even if it finds they are subject to work-product protection because the USA has a substantial need for them and cannot, without undue hardship, obtain them through alternative discovery.  (*Id.* at 22-25.)  The USA's final work-product argument is that the University has impliedly waived the work-product doctrine by placing its communications with its environmental consultants and the drafts attached to those communications at issue.  (*Id.* at 22-28.)

As to the attorney-client privilege, the USA asks this Court to find that communications involving PEER and Barr are not protected by the attorney-client privilege because the environmental consultants are third parties to the attorney-client relationship and the University has not shown that they fall under the "functional equivalent" of employees for the privilege to attach.  (*Id.* at 28-29.)

### 3.      The University's Opposition

In its opposition, the University argues that it anticipated litigation with the MPCA and the USA starting in 2001 due to the University's status as an owner of the GOW and

due to the differences in the University's and the USA's interpretations of the Indemnification Clause.  (Dkt. 167 at 15-16, 23.)

The University contends that the Documents serve a "dual purpose" that falls within the protection of the work-product doctrine and that the protection is not extinguished merely because the University submitted the final reports to the MPCA. (*Id.* at 18, 23-24.)  The University maintains that various courts, including the *Tonka* court, "agree that efforts like these that are made to comply with environmental agencies' directives and to conduct remediation in a way that avoids further penalties or enforcement actions constitute actions taken in anticipation of litigation, and the analysis that goes into related decisions concerning these compliance efforts can be properly withheld as work product."  (*Id.* at 18.)

The University urges this Court to consider the total factual circumstances of this case, noting that when the MPCA formally requested the USACE to conduct a Phase I Environmental Site Assessment of the GOW, the USACE declined that request based on the Indemnification Clause, and the University thereafter received the Request for Information from the MPCA which stated that the USACE was trying to "transfer environmental liability" to the University based on the Indemnification Clause.  (*Id.* at 25.)  The University maintains that its Deputy General Counsel at that time (William Donohue) was familiar with the implications of such a request from the MPCA due to his experience "with environmental enforcement proceedings and litigation through his work as Special Assistant General with the MPCA" and his experience representing the University in other formal regulatory proceedings with the MPCA and the Environmental

16

Protection Agency ("EPA"), and "had a subjective belief that litigation regarding potential contamination at the Site would occur." (*Id.* at 25-26.) Citing *Tonka* and several cases with favorable discussions of *Tonka*, the University argues that the courts in those cases considered the totality of the circumstances and found communications and draft reports prepared by environmental consultants to assist legal counsel in response to requests by an environmental agency were protected by the work-product doctrine. (*Id.* at 17-25.)

The University contends that other than arguing that the Documents are relevant, the USA has not shown it has a substantial need for them. (*Id.* at 28-37.) First, the University argues that because the USA has full access to the facts underlying the environmental reports and the final reports, it has alternative means to obtain the discovery it needs. (*Id.* at 29-30.) In addition, the USA has deposed two representatives of Barr and the University states that it has not impeded the USA's ability to depose PEER or other Barr employees. (*Id.* at 30.) To the extent the USA complains about the University's objections during those depositions (Dkt. 163 at 24), the University states that it only objected to questions that went to consultants' communications with counsel (Dkt. 167 at 30). As to costs, the University has produced unredacted invoices to the USA. (*Id.* at 30-31.) The University also argues that the USA is merely speculating that University counsel influenced the final reports and could have explored (and did) explore this issue during depositions. (*Id.* at 31-32.) The University says the USA has failed to explain why the Documents are necessary to determine if the costs sought by the University are necessary costs consistent with 42 U.S.C. § 9607(a)(4)(B). (*Id.* at 32-33.)

Finally, the University contends that the USA makes only an implied waiver argument, that the case relied on by the USA, *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726 (8th Cir. 2002), has no bearing on this dispute, and that the University has not waived any protection because it does not seek to make testimonial use of the work product at issue, but will instead rely on the final reports and invoices to support its claims.  (*Id.* at 34-36.)

The University also requests that if the Court finds the USA has met its burden of showing a substantial need for any of the Documents withheld on the basis of ordinary work product, that the Court give the University an opportunity to submit a revised privilege log and to provide copies of documents that constitute opinion work product for an *in camera* review.  (*Id.* at 28 n.7.)

As to attorney-client privilege, the University acknowledges that Minnesota law governs privilege principles and argues that while the Minnesota Supreme Court has not addressed the question of whether the privilege extends to the "functional equivalent" of employees, this District and the Eighth Circuit have recognized that extension.  (*Id.* at 38.)  The University ultimately asks the Court to defer a ruling on the issue of attorney-client privilege to allow it to serve a revised privilege log and for the Court to allow separate briefing on the privilege issue and perform an *in camera* review to determine whether the privilege attaches under the "functional equivalent" employees theory.  (*Id.* at 39.)

DuPont did not file a brief in support or opposition of the Motion.  However, at the August 30 hearing, DuPont generally asserted that the breadth of the Documents the University withheld on the basis of the work-product doctrine is overly broad.

18

## II.   <u>LEGAL STANDARD</u>

**A.    Work-Product Doctrine**

The work-product doctrine, first articulated in *Hickman v. Taylor*, 329 U.S. 495

(1947), is codified in Rule 26(b)(3)(A) of the Federal Rules of Civil Procedure, and

provides in pertinent part that:

> [A] party may not discover documents and tangible things that are prepared
> in anticipation of litigation or for trial by or for another party or its
> representative (including the other party's attorney, consultant, surety,
> indemnitor, insurer, or agent). But . . . those materials may be discovered if:
>
>> (i) they are otherwise discoverable under Rule 26(b)(1); and
>>
>> (ii) the party shows that it has substantial needs for the
>> materials to prepare its case and cannot, without undue
>> hardship, obtain their substantial equivalent by other means.

Fed. R. Civ. P. 26(b)(3)(A)(i)(ii).  The work-product doctrine serves to "promote the

operation of the adversary system by ensuring that a party cannot obtain materials that his

opponent has prepared in anticipation of litigation."  *Pittman v. Frazer*, 129 F.3d 983,

988 (8th Cir. 1997) (citing *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951

F.2d 1414, 1428 (3d Cir. 1991)).  Documents protected by the doctrine include "trial

preparation documents that contain the fruits of the attorney's investigative endeavors

and any compendium of relevant evidence prepared by the attorney."  *In re Murphy*, 560

F.2d 326, 337 (8th Cir. 1977).

The applicability of the work-product doctrine is factually intensive and depends

on the circumstances of the particular case.  *Marvin Lumber & Cedar Co. v. PPG Indus.,*

*Inc.*, 168 F.R.D. 641, 645 (D. Minn. 1996). The Eighth Circuit employs the following

test in determining whether the protection attaches:

> The test should be whether, in light of the nature of the document and the
> factual situation in the particular case, the document can fairly be said to have
> been prepared or obtained because of the prospect of litigation. But the
> converse of this is that even though litigation is already in prospect, there is
> no work product immunity for documents prepared in the regular course of
> business rather than for purposes of litigation.

*Id.* (quoting *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir. 1987)) (cleaned up).

"While the 'work product' may be, and often is, that of an attorney, the concept of 'work

product' is not confined to information or materials gathered or assembled by a lawyer."

*Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 603 (8th Cir. 1977).

Documents prepared in the ordinary course of business are not protected by the

work-product doctrine, however, the protection attaches once there is a reasonable

prospect of litigation. *Simon*, 816 F.2d at 401. And "[w]here work product is intertwined

between prospective litigation and non-litigation business purposes, the work product

doctrine should properly attach." *Marvin Lumber*, 168 F.R.D at 645.

The party seeking work-product protection bears the burden of establishing it. *In

re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 925 (8th Cir. 1997). In so doing,

the party must "(i) expressly make the claim; and (ii) describe the nature of the

documents, communications, or tangible things not produced or disclosed—and do so in

a manner that, without revealing information itself privileged or protected, will enable

other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A).

### 1.      Types of Work Product

The work-product doctrine can be categorized into two: ordinary work product and opinion work product. *Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000). The distinction between the two types of work product is an important one:

> Ordinary work product includes raw factual information. Opinion work product includes counsel's mental impressions, conclusions, opinions or legal theories. Ordinary work product is not discoverable unless the party seeking discovery has a substantial need for the materials and the party cannot obtain the substantial equivalent of the materials by other means. In contrast, opinion work product enjoys almost absolute immunity and can be discoverable only in very rare and extraordinary circumstances, such as when the materials demonstrate that an attorney engaged in illegal conduct or fraud.

*Id.* (quotations and citations omitted). The party seeking to overcome the work-product protection bears the burden of establishing substantial need and undue burden. *Id.*

### 2.      Waiver of Work-Product Protection

The work-product doctrine "is not absolute and may be waived." *Pamida*, 281 F.3d at 732. The Eighth Circuit has held that a party must intend to disclose a document that is otherwise protected by the work-product doctrine to waive the protection as to that specific document. *See Pittman*, 129 F.3d at 988; *see also In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, MDL No. 15-2666 (JNE/FLN), 2017 WL 5188342, at *5 (D. Minn. March 7, 2017) (finding that "[d]isclosure to a third party of a document otherwise protected as work product waives that protection if 'it has substantially increased the opportunities for potential adversaries to obtain the information'") (quoting Wright & Miller, *supra*, § 2023, and citing various cases). A waiver of work-product protection may also arise when the party seeking to assert the protection elects to make a

testimonial use of the alleged protected materials. *United States v. Nobles*, 422 U.S. 225, 239 (1975).

The work-product doctrine may be impliedly waived when the party claiming the protection brings a claim "in which the information allegedly protected is crucial and unavailable by other means," intends to waive the protection, and "the interests [of] fairness and consistency mandate a finding of waiver." *Pamida*, 281 F.3d at 732 (citing Wigmore, *Evidence in Trial at Common Law*, § 2327 at 636 (J. McNaughton rev. 1961)). In short, the protection should not be used to shield information that underlies the allegations and claims in a case. *In re Grand Casinos, Inc.*, 181 F.R.D. 615, 622 (D. Minn. 1998).

**B.    CERCLA**

Enacted in 1980, CERCLA "grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994). Under CERCLA, the Federal government may opt to clean up a contaminated area itself or may compel potentially responsible persons ("PRPs") to perform the cleanup. *Id.* Section 107(a) of the Act itemizes four classes of PRPs, including in pertinent part: "(1) the owner and operator of a vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of . . . ." *See* 42 U.S.C. §§ 9607(a). The PRPs are liable for:

> (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian Tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release. . . .

*Id.* The Act defines "respond" or "response" to mean "remove, removal, remedy, and remedial action . . . all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." *Id.* § 9601(25). Section 113(f)(1) of the Act "allows persons who have undertaken efforts to clean up properties contaminated by hazardous substances to seek contribution from other parties liable under CERCLA." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 160 (2004). "Accordingly, liability may be found under CERCLA extending to all potentially responsible parties." *FMC Corp. v. Northern Pump Co.*, 668 F. Supp. 1285, 1289 (D. Minn. 1987).

## III.   ANALYSIS

The USA challenges the sufficiency of the privilege log (Dkt. 163 at 11), but primarily focuses on whether the Documents were prepared in anticipation of litigation with the MPCA or USACE (*id.* at 11-22). The USA also argues that it has a substantial need for the Documents that requires their production even if protected by the work-product protection (*id.* at 22-25) and contends that the University waived any work-product protection (*id.* at 25-28). Finally, the USA argues the Documents are not protected by the attorney-client privilege. (*Id.* at 28-30.)

A.      **Sufficiency of the University's Privilege Log**

The USA makes a cursory challenge to the sufficiency of the privilege log,

asserting:

> First, the University's privilege log fails to adequately demonstrate that the documents in question are, in fact, subject to the work-product privilege. For instance, Entry No. 63 is an email from Steve Jansen of Peer Engineering and Rick Kubler of Lathrop Gage withheld as work-product, and is described only as "Discussing draft documents prepared in anticipation of litigation RE: Preliminary Environmental Investigation." There is simply nothing in this entry which demonstrates that the document is in fact subject to the work-product privilege.

(Dkt. 163 at 11.)

The University's 133-page privilege log contains six columns labeled "number,"

"date," "sender," "recipient," "privilege type," and "description." (*See* Dkt. 164-1 at 2.)

The Court finds the University's privilege log meets the requirements of Rule

26(b)(5)(A). The USA challenges only the sufficiency of the descriptions. (*See* Dkt. 163

at 11 (document "is described only as . . .").) The log describes each document using

phrases such as "Discussing draft documents prepared in anticipation of litigation RE:

revisions to Work Plan and FSP per MPCA Comments," "Discussion of strategy in

anticipation of litigation RE: public meeting," "Discussing draft documents prepared in

anticipation of litigation RE: remedial investigation comments from Dakota County,"

"Discussing draft documents prepared in anticipation of litigation RE: meeting with

MPCA" and "Providing legal advice RE: USACE response to letter," and provides the

date the communication was made along with the names of the senders and recipients

(with a few exceptions). (*See, e.g.*, Dkt. 164-1 at 115, 116, 118, 119, 132.)

24

Although the log does not identify which of the senders and recipients are attorneys, the USA did not dispute that the communications involved attorneys or challenge the log on the ground that any sender or recipient (other than Barr and PEER) was not an attorney and therefore rendered the communication not privileged or protected by the work-product doctrine or resulted in waiver.  In the absence of a more thorough argument from the USA, and based on the facts of this case, the Court concludes that the log describes the documents "in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  *See* Fed. R. Civ. P. 26(b)(5)(A); *Luminara Worldwide, LLC v. Liown Elecs. Co.*, No. CV 14-3103 (SRN/FLN), 2015 WL 9861106, at *3 & n.1 (D. Minn. Oct. 5, 2015) (finding initial descriptions of "Legal advice re license," "Legal advice re intellectual property," and "Legal advice re litigation" insufficient but more detailed descriptions adequate), *objections overruled*, No. 14CV03103SRNFLN, 2016 WL 6774229 (D. Minn. Nov. 15, 2016).  Indeed, the USA was able to discern that certain attachments to communications related to specific reports and investigations from the privilege log.  (*See* Dkt. 163 at 6 (identifying drafts of Preliminary Environmental Investigation and 2017 Remedial Investigation).)  The Court denies the Motion insofar as the USA challenges the sufficiency of the privilege log.

## B.   The Documents Were Prepared in Anticipation of Litigation with the MPCA and USACE

The Court next addresses the USA's argument that the Documents were not prepared in anticipation of litigation because, according to the USA, they were created to

avoid litigation, and are therefore not protected under the work-product doctrine. (Dkt.
163 at 16-22.)

The USA relies on the purposes set forth in various final reports (which the
University has produced in this litigation) to support this argument, including:

- "to evaluate the potential presence of environmental impacts at six primary areas
  where former GOW operations occurred" (Dkt. 163 at 12);

- "develop a conceptual site model of hydrogeologic conditions within the UMA
  and UMore Park (study area) and construct a groundwater flow model that can be
  used to evaluate potential impacts of and associated mitigation strategies for the
  proposed mining and ancillary site operations within the UMA" (*id.* at 13);

- "to collect information needed to identify and assess potential risks to human
  health and the environment associated with historical uses of the property so that
  cleanup alternatives can be developed in the future to address any unacceptable
  risks" (*id.*); and

- "to investigate known and potential releases of hazardous substances and
  petroleum products with the former GOW and post-GOW land uses" (*id.* at 14).

The University responds that documents created by an environmental consultant in
response to an agency's request can serve a "dual purpose" that falls within the protection
of the work-product doctrine, even if they also serve a non-litigation purpose. (Dkt. 167
at 16-17.) The University further responds that "courts regularly find that documents
prepared by environmental consultants—including draft investigation reports and
communications with counsel—are protected work product." (*Id.* at 17 (citing *Tonka*).)

The parties' arguments focus on *Ford Motor* and *Tonka*, *supra*, where the USA
argues that the Court should follow *Ford Motor* (Dkt. 163 at 18-22) and the University
argues that the Court should follow *Tonka* (Dkt. 167 at 17-38). The Court therefore
discusses those cases below.

26

In *Ford Motor*, the EPA, the Agency for Toxic Substances and Disease Registry, and the Michigan Department of Natural Resources investigated and evaluated a property in 1988 that was formerly owned by Ford Motor Company ("Ford") which Ford used for wastewater treatment through a subsidiary named Rouge Steel.  2013 WL 5435184, at *1. Ford purchased the property from MichCon in 1966 and maintained liability for hazardous substances when Ford sold Rouge Steel to a company that ultimately merged into the Rouge Steel Company.  *Id.*  Severstal Dearborn, LLC ("Severstal") purchased the Rouge Steel Company assets, including the property at issue, in 2004.  *Id.*

In 1998, the EPA performed a multimedia inspection on the property and in 1999, Ford received notice from the EPA that the property was a "'high priority' for environmental cleanup."  *Id.* at *2.  Ford and Rouge Steel as a result entered into a voluntary agreement with the State of Michigan to investigate and remediate the property to satisfy the requirements of the Resource Conservation and Recovery Act, resulting in a Corrective Action Consent Order ("CACO"), which was finalized in May 2000.  *Id.*  The State of Michigan accepted their proposal and asked the EPA to hand over regulatory authority for this site to the Michigan Department of Environmental Quality ("MDEQ"). *Id.*  Ford contracted with environmental consultant Conestoga Rovers and Associates ("CRA") to assist it with negotiating the CACO, preparing environmental reports in compliance with the CACO, and to clean up the property.  *Id.*

Ford and Severstal later filed suit for recovery costs against MichCon.  *Id.* at *1. During the pendency of that suit, MichCon sought to obtain draft reports for CRA's environmental investigation and communications between plaintiffs and CRA which had

27

been withheld as protected work product.  *Id.* at *2.  Ford and Severstal argued that they were operating under the specter of enforcement litigation once they engaged CRA in connection with the CACO, and as a result, documents created by CRA were created in anticipation of litigation with the EPA or MDEQ.  *Id.* at *3.  Ford and Severstal also argued that litigation was anticipated after they approached MichCon for a portion of the response costs in 2000 but were unable to reach an agreement.  *Id.* at *2-3.

The court in *Ford Motor* rejected Ford and Severstal's argument that they anticipated litigation with the MDEQ/EPA, stating:

> Plaintiffs' position relies on the assumption that Plaintiffs knew that they would (or that they intended to) fail in their efforts under the CACO; that is, that they would ultimately be in violation of some environmental act or policy, which would allow the MDEQ or the EPA to pursue them.  This is always a threat; the documents at issue were created to avoid litigation, not in anticipation of litigation.  And with regard to the instant litigation [with MichCon], Plaintiffs' contention is circular.  If Plaintiffs are to be believed, they created a mountain of paperwork in anticipation of a lawsuit in which their ultimate goal was to obtain payment for creation of the same mountain of paperwork.  Therefore, the Court finds that the potential litigation with the EPA, the MDEQ, or [MichCon] is not a sufficient basis under which to assert work-product protection.

*Id.* at *4 (footnote omitted).  The court did note that Ford and Severstal had asserted at the hearing that they made the decision to sue MichCon in 2006 and that documents created after that date were protected, but did not decide that issue as MichCon had not had the chance to respond.  *Id.* at *4 n.3.

In *Tonka*, a case relied on by the University, the defendant Tonka Corporation notified the EPA in 1981 that a site in Mounds, Minnesota might be a potential hazardous waste site pursuant to CERCLA.  140 F.R.D. at 384.  Accordingly, Tonka and the MPCA

conducted investigations at the site between 1982 and June 1984. *Id.* In June 1984, elevated levels of hazardous waste were discovered near the site and on February 5, 1985, the MPCA directed Tonka to retain consultants to assess the magnitude of groundwater and soil contamination at the site, which led to Tonka retaining Barr as an environmental consultant. *Id.* at 384 & n.3. In 1986, pursuant to MERLA, the MPCA issued a "Request for Response Action" naming Tonka as a responsible party for pollution at the site and requested that Tonka investigate, remediate, and monitor the site, or otherwise face harsh consequences. *Id.* at 385.

In 1985, Tonka notified its insurers of its obligations to remediate the site and in May 1987, Barr prepared a remedial investigation report. *Id.* Tonka, along with its insurer, financed the investigations and cleanup of the site. *Id.* The insurer thereafter filed a declaratory action for its costs and Tonka filed a counterclaim against that insurer and other insurers seeking indemnification of its response costs. *Id.* at 383. The insurers sought various documents from Tonka during discovery, including draft reports and communications by and to Tonka's engineering consultants. *Id.* Tonka withheld documents that were circulated between Tonka, Tonka's counsel, and Tonka's consultants that were not provided to the MPCA pursuant to the work-product doctrine due to its anticipated litigation with the MPCA. *Id.* at 383, 387. The insurers then sought to compel production of those documents. *Id.*

The *Tonka* court focused on "whether counsel's investigation and Tonka's subsequent remedial measures were conducted in the course of Tonka's ordinary business or in anticipation of litigation." *Id.* at 389. The court found communications and

29

documents prepared after the MPCA directed investigation and remediation of the site in February 1985 were properly withheld, reasoning that documents generated from Tonka's efforts to fulfill its obligations were generated in anticipation of litigation with the MPCA once hazardous substances were discovered at the site in 1984 and the MPCA directed Tonka to investigate and remediate the site in February 1985. *Id.* at 389-90. The court noted that the "threat of litigation with the MPCA was the motivating factor which moved Tonka to complete the cleanup of the [site]" and "the consultants' preliminary drafts of documents which were ultimately submitted to the MPCA and the underlying data for those documents [were] the fruits of counsel's investigation endeavors." *Id.* As the *Tonka* court explained:

> The MPCA's designation of responsible party status thus imposes a huge obligation on the responsible party and requires a responsible party to make important strategic decisions about whether to comply with the MPCA's request. Any action that a company takes in response to the MPCA's requests before and after designation of responsible party status are therefore made under the strong prospect of future litigation over issues such as the propriety of the designation of responsible party status, the scope of the clean up and the adequacy of the clean up. The fact that Tonka was able to avoid actual litigation with the MPCA in this case does not mean that the efforts undertaken by Tonka's counsel and its consultants were not done in anticipation of litigation.

*Id.* at 389-90 (citations omitted). The *Tonka* court also found:

> Although litigation was always a prospect from the moment Tonka notified the EPA of the existence of the Tonka Main Site pursuant to CERCLA, before the MPCA issued its Request for Initial Investigation the prospect of litigation was too remote to enable the court to conclude that the documents at issue here were prepared or obtained *because* of the prospect for litigation.

*Id.* at 390.

Neither *Ford Motor* nor *Tonka* is controlling precedent, and the Court is mindful

30

of the Eighth Circuit's instruction that "the test [for work-product protection] should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Simon*, 816 F.2d at 401 (cleaned up).  Further, as U.S. Magistrate Judge Hildy Bowbeer recently explained, when determining at what point the prospect of litigation arose sufficiently to invoke work-product protection under Rule 26(b)(3), and whether the documents at issue were prepared because of the prospect of litigation, "the Court must be mindful of the Eighth Circuit's admonition that 'the work product doctrine is to be applied in a commonsense manner in light of reason and experience as determined on a case-by-case basis.'" *S.T. Specialty Foods, Inc. v. Copesan Servs. Inc.*, No. 19-CV-0339 (NEB/HB), 2020 WL 30281, at *5 (D. Minn. Jan. 2, 2020) (quoting *Pittman v. Frazer*, 129 F.3d 983, 988 (8th Cir. 1997)).  Judge Bowbeer further explained that "work product protection may arise even when there has been no explicit threat of litigation so long as the prospect of litigation is 'identifiable because of specific claims that have already arisen.'" *Id.* (quoting *McConnell v. Farmers Ins. Co., Inc.*, No. 07-4180-CV-C-NKL, 2008 WL 510392, at *2 (W.D. Mo. Feb. 25, 2008)).  Courts should "examine objective evidence, such as the 'factual situation' and the 'nature of the documents' to determine whether a document 'can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *Id.* (quoting *Simon*, 816 F.2d at 401).

The factual situation in this case is as follows: In May 2001, the MPCA sent the Request for Information to the University, alerting the University of contaminations at the Site.  (*See* Dkt. 168-1, Ex. 1; Dkt. 169 ¶ 4.)  The Request for Information stated the

MPCA's intent to ensure the Site was investigated and remediated (Dkt. 168-1, Ex. 1 at 1) and notified the University of the USACE's attempt to "transfer environmental liability" for the Site to the University due to the Indemnification Clause (*id.* at 2).

William Donahue, the University's Deputy General Counsel at that time, stated in his declaration that in his "roles as Special Assistant Attorney General for the State of Minnesota," where he represented the MPCA for five years, "and Deputy General Counsel of the University," he "had prior experience with Superfund and other environment enforcement and litigation matters . . . includ[ing] representing the University since the early 1980s with respect to the University of Minnesota Rosemont Research Center Superfund Site" and representing the MPCA as a member of the Attorney General's legal staff. (Dkt. 169 ¶¶ 2-3, 10.) Donohue stated that after the University received the MPCA's Request for Information on June 1, 2001, he "anticipated the matter would likely result in litigation," retained the University's Outside Legal Counsel to provide legal advice with regard to the Request for Information and as to Superfund liability in July 2001, and retained PEER in October 2001 to review the information requested by the MPCA and "assist legal counsel to provide advice to the University on the likelihood that the GOW caused significant environmental issues and the University's potential liability for those issues." (*Id.* ¶¶ 8-9, 12.)

Donohue further stated that the University retained Barr in 2008 "to assist the Office of the General Counsel and outside environmental counsel in providing legal advice to the University regarding its potential environmental liability and in anticipation of litigation." (*Id.* ¶ 14.) Donohue stated that he "anticipated that the GOW matter

would likely result in litigation between the University, the MPCA, the United States, and potentially other parties," and that the University retained Outside Legal Counsel and the environmental consulting firms to act as consulting experts "with the explicit understanding that their work was for the purpose of enabling us to provide legal advice to our client with our legal opinions," where the advice was "informed by technical information developed by the environmental consultants working under the direction of the attorneys."  (*Id.* ¶ 15.)  Donohue identified the University's potential Superfund liability, MPCA enforcement actions, and the University's claims against the USACE and other potentially responsible parties as the anticipated litigation.  (*Id.* ¶¶ 13-14.)

Donohue's belief, based on his experience, that the MPCA's Request for Information sent on May 31, 2001 would likely result in litigation with the MPCA and USACE is consistent with the findings of several courts that similar requests from environmental agencies create the prospect of litigation, including with parties other than the agency.  *See, e.g.*, *Atl. Richfield Co. v. Current Controls, Inc.*, No. 93-CV-0950E(H), 1997 WL 538876, at *2 (W.D.N.Y. Aug. 21, 1997) ("In light of the surrounding circumstances—including the EPA's activities and the nature of environmental law, which often leads to litigation involving numerous parties with past or present associations with contaminated property—that belief was objectively reasonable."); *Briggs & Stratton Corp. v. Concrete Sales & Servs.*, 174 F.R.D. 506, 509 (M.D. Ga. 1997) ("In situations involving environmental cleanups the strong prospect of future litigation arises at the time potentially responsible parties are identified."); *Tonka*, 140 F.R.D. at 389-90 ("Any action that a company takes in response to the MPCA's requests

33

before and after designation of responsible party status are therefore made under the strong prospect of future litigation over issues such as the propriety of the designation of responsible party status, the scope of the clean up and the adequacy of the clean up.").

Other objective evidence supports a finding that the University reasonably anticipated litigation with the MPCA and USACE after receiving the May 31, 2001 Request for Information and has continued to do so at least until filing this lawsuit. As stated above, the University retained Outside Legal Counsel to provide legal advice with regard to the Request for Information and as to Superfund liability in July 2001, shortly after receiving the Request for Information. (Dkt. 169 ¶ 9.) Further, PEER was retained in October 2001 through the University's Outside Legal Counsel "in order to keep the work products and communications produced by PEER confidential" (Dkt. 168-4, Ex. 4 at 2) and retained for purposes of reviewing the information requested by the MPCA and "assisting legal counsel to provide advice to the University on the likelihood that the GOW caused significant environmental issues and the University's potential liability for those issues" (Dkt. 169 ¶ 12).

The addendum to the University's 2006 contract with PEER for its Phase I Environmental Site Assessment states:

> [PEER] acknowledges that the services it performs under this Agreement are provided at the request of, for the benefit of, and to assist, the University' legal counsel in rendering legal services and providing confidential legal advice to the University. [PEER] further acknowledges that the services it performs under this Agreement are provided in anticipation of potential litigation between the University and third parties including, but not limited to, federal, state or local regulatory authorities and persons or entities potentially responsible for releases of hazardous substances, pollutants or contaminants on, under, adjacent to or affecting the [GOW]. [PEER] agrees

to preserve the confidentiality of all communications with [the] University and its legal counsel with respect to the services performed under this Agreement, and further agrees that it will not reveal its conclusions, assessments, opinions or observations reached or developed under this Agreement to any person or entity without the prior, express, written approval of the University or its legal counsel.

(Dkt. 168-12, Ex. 12 at 11).

As to Barr, the 2008 consulting agreement for Barr's services provided in

pertinent part:

> Nature of Services.  . . . .  The University seeks [Barr's] services in anticipation of potential litigation . . . between the University and third parties including, but not limited to, federal regulatory authorities.  By signing this Agreement, [Barr] acknowledge[s its] understanding that [it is] being retained to assist the University in connection with anticipated litigation by the University. . . .

> Confidentiality.  By entering into this agreement, [Barr] agrees to keep all information provided to [it] . . . and other information learned by [it] through [its] retention confidential.  By signing this Agreement, you acknowledge that materials and information disclosed to you during the course of your work on this matter, along with the work you perform, will be confidential and proprietary, and subject to the attorney-client and work product privileges . . . .

(Dkt. 168-13, Ex. 13 at 1 ¶¶ 1-2.)

Based on the record, the Court finds that the University both subjectively and reasonably anticipated litigation with the MPCA and the USACE after receiving the May 31, 2001 Request for Information on June 1, 2001.  The fact that litigation did not commence until the University brought this action in 2017 does not require the conclusion that the University did not reasonably anticipate litigation in 2001.  *See Safco Prod. Co. v. Welcom Prod., Inc.*, No. CV 08-4918 (JRT/JJG), 2010 WL 11252007, at *4 (D. Minn. Feb. 10, 2010) ("[L]itigation may be anticipated long before it is actually

35

commenced.").  Indeed, the USA stated at the hearing that it did not dispute that the University contemplated litigation as early as 2001, and conceded in its brief that certain documents prepared by the environmental consultants ("a list of facts relevant to asserting a defense to an MPCA enforcement action against the University") could have been prepared in anticipation of litigation.  (Dkt. 163 at 17-18.)

Moreover, Donohue, who was intimately involved with legal issues around the Site, stated that he anticipated litigation with both entities as of June 2001 and that Barr and PEER were retained to assist counsel in providing legal advice, informed by the technical information the consultants developed, with respect to Superfund liability, MPCA enforcement actions, and the University's claims against the USACE.  (Dkt. 169 ¶¶ 8-9, 12-15.)  The Barr and PEER agreements confirm that they were retained by the University's Outside Legal Counsel—consistent with Donohue's declaration—and reference the parties' understanding of the need for confidentiality and that the environmental consultants were retained in anticipation of potential litigation.  (Dkt. 168-4, Ex. 4 at 2; Dkt. 168-12, Ex. 12 at 11; Dkt. 168-13, Ex. 13 at 1 ¶¶ 1-2.)  While the October 2001 engagement letter with PEER does not specifically reference litigation, in view of Donohue's declaration, including that the University anticipated litigation after receiving the Request for Information from the MPCA on June 1, 2001 and that PEER's initial scope of work included "reviewing the information requested by the MPCA Superfund Program and assisting counsel to provide advice to the University on the likelihood that the GOW caused significant environmental issues and the University's potential liability for those issues" (Dkt. 169 ¶ 12), the Court finds that the University's

36

Outside Legal Counsel engaged PEER in October 2001 to assist counsel with providing legal advice to the University in anticipation of litigation.

As the University notes, numerous courts have found draft reports and communications with environmental consultants under similar circumstances to have been created in anticipation of litigation and protected work product. *See, e.g.*, *In re Grand Jury Subpoena*, 357 F. 3d 900, 908-09 (9th Cir. 2004) ("Here, Ponderosa's response to the Information Request and its accession to the Consent Order were done under the direction of an attorney in anticipation of litigation. By cooperating with the EPA, Ponderosa sought to avoid litigation with the government. . . . The withheld documents, however, just like the others, were prepared by [the environmental consultant], at least in part, to help [counsel] advise and defend Ponderosa in anticipated litigation with the government. Thus, the withheld documents fall within the broad category of documents that were prepared for the overall purpose of anticipated litigation."); *NL Indus., Inc. v. ACF Indus. LLC*, No. 10CV89W, 2015 WL 4066884, at *7 (W.D.N.Y., July 2, 2015) (finding work-product protection applied to materials prepared by an environmental consultant where the company retained the consultant "to guide it through the cleanup and to identify possible responsible parties and defenses for [the company] and its attorneys to provide its legal defense and advocate for its claims"); *Atl. Richfield*, 1997 WL 538876, at *2-4 (finding "(1) draft reports, proposals and plans prepared by [site owner's] consultants that (a) contain testing, remediation and cost data, (b) were reviewed by [site owner's] in-house lawyers and other [site owner] employees and (c) were then finalized and submitted to the EPA; and (2) correspondence among in-

house lawyers, other [site owner] employees and consultants regarding the consultants' reports, proposals and plans" protected by work-product doctrine) (discussing *Tonka*); *Briggs & Stratton*, 174 F.R.D. at 509 (upholding the assertion of work-product protection and finding documents prepared by environmental consultants in response to an EPA order for cleanup "were not produced voluntarily or for any business purpose which existed apart from the EPA order" and because the "extensive costs involved in the clean-up and the possibility of identifying other potentially responsible parties to share in the costs" created the reasonable conclusion that "litigation was contemplated against any other potentially responsible party from the time of issuance of the EPA order") (discussing *Tonka*); *Tonka*, 140 F.R.D. at 389-90 (documents generated by Barr and other consultants relating to investigations and to prepare reports responsive to MPCA directives were protected by work-product doctrine). Here, based on the facts of this case, the Court finds that the Documents were prepared in anticipation of litigation with the MPCA and the USACE.[5]

The USA relies on Barr representative Jim Eidem's deposition testimony that he did not recall "any other purpose" for the 2012 Remedial Investigation report and 2017 Remedial Investigation report other than "to investigate known and potential releases of hazardous substances and petroleum products with the former GOW and post-GOW land

---

[5]     As to the MPCA's funding of the 2002 Preliminary Environmental Investigation, in view of the fact that PEER worked only for the University, the University controlled the investigation and report preparation, and the University's Outside Legal Counsel had to review and comment on the report before it was provided to the MPCA (Dkt. 168 ¶ 8; Dkt. 168-5, Ex. 5 at 3-4; Dkt. 168-6, Ex. 6), this funding does not alter the Court's conclusion that this report was prepared in anticipation of litigation.

uses," identify strategies to address them and data gaps, and "assist in the planning and

implementation of future site-specific activities" to demonstrate that the Documents were

not prepared in anticipation of litigation.  (Dkt. 163 at 14.)  However, Eidem also testified

that "everything" Barr did "from the get-go" was "related to litigation support" and "in

preparation for litigation" and that part of his job was assisting the University in

preparing for litigation.  (Dkt. 168-14, Ex. 14 at 4, 7.)  The Court concludes that Eidem's

testimony, when considered in context, supports a finding that Barr's technical work was

performed to assist the University's legal counsel in anticipation of litigation with the

MPCA and the USACE.

      The USA argues that this case is factually different from *Tonka* because "[t]he

court in *Tonka* held that litigation was not anticipated with the MPCA until after the

MPCA issued a formal 'Request for an Initial Investigation,' which was followed up by a

formal 'Request for Response Action.'"  (Dkt. 163 at 21.)  The *Tonka* court found—

under the circumstances of that case—that the "prospect of litigation was too remote"

before the MPCA sent a letter in February 1985 to Tonka's lawyer asking that Tonka

retain a consultant and take steps to assess contamination at the site.  140 F.R.D. at 384,

390.  But the *Tonka* court did not impose a "formal request" requirement for documents

to be generated in anticipation of litigation or hold that a particular type of document

(whether a Request for an Initial Investigation or otherwise) is required.  In fact, requiring

a particular type of document (whether a "formal request," identification as a potentially

responsible party, or something else) to trigger the prospect of litigation such that the

work-product protection would attach is inconsistent with the Eighth Circuit's

admonition that "the work product doctrine is to be applied in a commonsense manner in light of reason and experience as determined on a case-by-case basis." *Pittman*, 129 F.3d at 988.

The USA also argues that "*Tonka*'s approach would protect routine business planning and operational records related to all sorts of regulated activities from discovery . . . ." (Dkt. 163 at 20.) This "slippery slope" argument ignores the fact that the test for work-product protection is "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Simon*, 816 F.2d at 401. The fact that a business activity is "regulated" does not necessarily mean that test is met, but here, where the MPCA stated its intent to investigate and remediate the Site on May 31, 2001, was seeking information from the University, and had informed the University that the USACE was attempting to "transfer environmental liability" to the University, the prospect of litigation was real enough for work-product protection to attach. The Court also finds unpersuasive the USA's argument that "it may well be true that the University hired consultants to investigate contamination to avoid some sort of enforcement action from the MPCA if it had failed to conduct the environmental investigations, **but this work was clearly not done solely in anticipation of that very same litigation the University sought to avoid**." (Dkt. 163 at 17 (emphasis added).) There is no requirement that the work be done "solely in anticipation of litigation," rather, "[w]here the work product of the attorneys is intertwined between prospective litigation and non-litigation business purposes, the work product doctrine should properly attach." *Marvin*

*Lumber*, 168 F.R.D at 645.

As for *Ford Motor*, the USA has cited no other decision applying the reasoning of that case. Other courts have found work performed by environmental consultants under circumstances similar to those in *Ford Motor*—that is, pursuant to a consent order—to constitute work performed in anticipation of litigation. *See, e.g.*, *In re Grand Jury Subpoenas*, 357 F.3d at 908 ("Here, Ponderosa's response to the Information Request and its accession to the Consent Order were done under the direction of an attorney in anticipation of litigation. By cooperating with the EPA, Ponderosa sought to avoid litigation with the government."); *Atl. Richfield*, 1997 WL 538876, at *2-3 (documents containing testing, remediation and cost data created in response to a consent order and reviewed by site owner's in-house counsel before being finalized and submitted to the EPA and correspondence among in-house lawyers, other employees and consultants regarding the consultants' reports, proposals and plans were prepared in anticipation of litigation). Regardless of the reasoning in *Ford Motor*, based on the facts of this case, the Court finds the University reasonably anticipated litigation with the MPCA and USACE after it received the May 31, 2001 Request for Information (again, which included the statement that the USACE was attempting to "transfer environmental liability" from the USACE to the University).

The USA also argues that the "circular" nature of the fact that the costs the University incurred to address environmental contamination are "the *exact same* costs" it paid Barr and PEER to prepare for litigation with the MPCA and USACE makes the University's claim that such work was in anticipation of litigation "absurd[]." (Dkt. 163

41

at 21-22.)  This argument runs afoul of the principle that the work-product doctrine can attach "[w]here the work product of the attorneys is intertwined between prospective litigation and non-litigation business purposes."  *Marvin Lumber*, 168 F.R.D at 645.

Having considered the factual situation and the nature of the Documents, the Court finds that the Documents were prepared in anticipation of litigation with the MPCA and USACE, that the University's subjective belief that litigation with those entities was likely after receiving the MPCA's Request for Information on June 1, 2001 was objectively reasonable, and that the Documents are protected work product.

## C.   The USA Has Not Shown Substantial Need for the Documents or that the USA Cannot Obtain the Substantial Equivalent Through Alternative Discovery

In the alternative, the USA asks the Court to order production of the Documents even if they are protected work product on the ground that the USA has a substantial need for the information they contain and cannot obtain that information by other means. (Dkt. 163 at 22-25.)  The USA argues that: (1) the Documents "bear directly upon the accuracy and weight that should be placed upon the engineering firms' conclusions in their final, publicly available reports"; (2) the Documents "may show how the engineering firms' conclusions have 'changed over time'"—that is, whether the conclusions in the report were influenced by the University and its attorneys; (3) the Documents may reveal the reasonableness of the "necessary" response costs incurred by the University; and (4) the USA has no alternative means to obtain them.  (*Id.*)  In so arguing, the USA contends that the Documents fall under the category of ordinary work product because they involve environmental consultants' communications and draft

documents, and to the extent they contain opinion work product, are opinions of non-attorneys.  (*Id.*)

The University responds that it has produced unredacted invoices that reflect the University's response costs, final versions of the draft reports at issue, and the factual information and objective data underlying the reports.  (Dkt. 167 at 30-33.)  Moreover, the USA has already deposed two Barr representatives, one of whom (Eidem) appears to have had extensive involvement with Barr's final reports submitted to the MPCA on behalf of the University, and the University asserts that it has not impeded the USA's attempt to depose other representatives of Barr and PEER.[6]  (*Id.* at 30; *see also* Dkt. 163 at 14 (describing Eidem as "lead author" of 2012 Remedial Investigation).)

The Court concludes that the USA has not met its burden of showing substantial need or that it cannot obtain the substantial equivalent of the Documents through other means.  There is no dispute that the University has produced the final reports, underlying data and factual information, and unredacted invoices, or that Barr and PEER witnesses were and are available for deposition, and the USA has not explained why it cannot challenge, for example, whether the costs sought are "necessary" and whether the

---

[6]     The USA bases its "substantial need" argument in part on the University's objections made during those depositions.  (Dkt. 163 at 24.)  Having reviewed the transcripts, and in view of the fact that the USA did not seek any relief from the Court during the depositions or shortly thereafter, the Court concludes that the University's objections do not establish substantial need or that the USA cannot obtain the substantial equivalent of the information it seeks through other means, including because Eidem testified that draft reports were shared with the University and Outside Legal Counsel and that changes were made to the reports based upon their comments if they were technically sound.  (Dkt. 164-8, Ex. 8 at 14; Dkt 168-14, Ex. 14 at 3.)

technical conclusions drawn are accurate using that discovery and the opinions of the

USA's own experts.  Rather, the USA's arguments amount to speculation that the

University's work product will reveal that Barr's and PEER's conclusions were

influenced by the University and its attorneys.[7]  (See Dkt. 163 at 23 ("The United States

has a need to see the engineering firms' 'unadorned views on the key issues,' i.e. sources

of contamination, prior to input from the University and its attorneys.  Further, the

communications and drafts may show how the engineering firms' conclusions have

'changed over time.'") (citing Rumble v. Fairview Health Servs., No. 14-CV-2037

(SRN/FLN), 2016 WL 4515922, at *4 (D. Minn. Aug. 29, 2016)).)[8]  The USA has not

explained why it could not explore this topic through depositions, and in fact did ask

Eidem if he made changes based on input from the University.  (Dkt. 168-14, Ex. 14 at

3.)  The Court concludes, as several other courts have in this context, that the USA has

not shown a substantial need for the Documents or that the USA is not able to obtain the

substantial equivalent through other means, including the final reports, underlying facts

---

[7]     During the hearing, the USA postulated that the environmental consultants could
have added statements that the USA was responsible for the Site contamination at the
direction of the University and its lawyers.  When asked why the University's lawyers
would tell the consultants to add a statement along those lines, the USA responded,
"Well, I think clearly that could have been put in to support its anticipated litigation
against the United States" and that there could be "a litigation benefit" to including that
statement in the reports.  This rationale plainly undermines the USA's position that the
environmental consultants' reports were not prepared in anticipation of litigation.

[8]     Notably, Rumble involved interview notes containing witnesses' initial testimony
as to key issues, where many of the witnesses no longer remembered "what they said, or
certain details about the care [the plaintiff] had received."  2016 WL 4515922, at * 3.  As
noted in Rumble, a failure in witness memory can constitute undue hardship, id. at *3, but
those circumstances are not present here.

and data, unredacted invoices, and witness depositions.  *See, e.g.*, *Atl. Richfield*, 1997 WL 538876, at *3 (finding no substantial need where site owner had "produced the final versions of the draft reports, plans and proposals that are at issue" and withheld no underlying factual information or objective data); *Briggs & Stratton*, 174 F.R.D. at 510-11 (finding no substantial need and no showing that information could not be obtained through other discovery where site owner agreed to produce unredacted bill and had produced "all factual information contained in the withheld documents . . . and all underlying analytical data . . ." relating to the environmental consultant's cleanup of the site).

Finally, the USA suggests that the Documents should be produced because the USA produced its communications with its environmental consultants and any attached drafts.  (*See* Dkt. 163 at 24.)  This has no bearing on the legal analysis.  The question is whether the USA has shown substantial need for the Documents to prepare its case and whether the USA cannot, without undue hardship, obtain the substantial equivalent of the information contained in the Documents by other means.  *See* Fed. R. Civ. P. 26(b)(3)(A)(ii).  As explained above, the USA has not met its burden in either regard.

**D.    The University Did Not Waive Protection of the Work-Product Doctrine**

Relying on *Pamida*, *supra*, the USA's final argument is that the University waived the work-product protection by bringing its claims against the USA.  (Dkt. 163 at 25.) The USA argues that the University seeks to use the University's environmental consultants' investigations in establishing its case against it and that the University's attempt to recover necessary costs results in an implied waiver of the work-product

45

protection.[9]  (Dkt. 163 at 26-28.)  In response, the University contends that *Pamida* is

distinguishable and that it does not intend to make testimonial use of the Documents, but

instead will rely on the final reports and unredacted invoices which have been made

available to the USA.  (Dkt. 167 at 35.)

In *Pamida*, the Eighth Circuit found an implied waiver of work-product protection

in an indemnification action where the "crucial issues" were "the nature of the work the

attorneys performed in the patent infringement action [for which Pamida sought

indemnification], what actions were taken by Pamida to notify Dynasty of the patent

infringement action and of Pamida's claim for indemnification, and whether the $750,000

incurred in attorneys' fees was reasonable."  281 F.3d at 732.  The question was not only

"whether Pamida intended to waive the privilege, but also whether the interests of

fairness and consistency mandate a finding of waiver."  *Id.*  The USA contends the

University's "investigations established key facts in its claims against the United States"

but that the University "seeks to shields inquiry into how these investigations were

actually conducted and the reports finalized."  (Dkt. 163 at 25.)  The USA, however, has

not explained why it cannot inquire into "how these investigations were actually

conducted" and whether PEER's and Barr's conclusions "evolved" using the final reports

and witness depositions.  As to the USA's arguments that the University has put its

response costs at issue (Dkt. 163 at 26), the USA has not explained why it cannot explore

whether the costs were necessary based on the unredacted invoices as well as the other

---

[9]     The USA did not identify any direct waiver.

information produced in this case.  Unlike *Pamida*, where Pamida refused to disclose any

information about the underlying work for which it sought indemnification, 281 F.3d at

729, the University has produced extensive information about its work, including the

final reports, underlying data and objective facts, and unredacted invoices.  Under these

circumstances, the Court finds that the interests of fairness and consistency do not

mandate a finding of waiver.  *Id.*  Moreover, the Court finds *Pamida* inapposite here for

two other reasons: it is the USA, not the University, who seeks to make testimonial use of

the Documents, and the USA has not shown it requires the Documents to explore how

Barr and PEER's conclusions changed and whether the response costs are necessary.

*See, e.g.*, *UnitedHealth Grp. Inc. v. Columbia Cas. Co.*, No. CV 05-1289 (PJS/SRN),

2010 WL 11537514, at *25 (D. Minn. Aug. 10, 2010) (rejecting application of *Pamida*

where "the information sought was not crucial and unavailable by other means because of

independent evidence that can demonstrate the same information" and "most importantly,

the party claiming the privilege . . . does not intend to make testimonial use of the work

product") (cleaned up); *see also In re Murphy*, 560 F.2d at 339 n.24 ("When the opposing

party, rather than the party seeking to preserve the work product privilege, calls witnesses

and questions them as to events that may be discussed in the work product, there is no

waiver under *Nobles*.") (citing *United States v. Nobles*, 422 U.S. 225, 239 (1975)).  For

these reasons, the Court finds the University did not waive work-product protection for

the Documents.[10]

---

[10]     Because the Court denies the Motion based on work-product protection, the Court
does not reach the parties' arguments as to the attorney-client privilege.

## IV. <u>ORDER</u>

For the reasons stated above, and based upon all the files, records, and proceedings herein, **IT IS ORDERED THAT** the United States of America's Motion to Compel (Dkt. 160) is **DENIED**.

DATED: October 29, 2021          <u>*s/Elizabeth Cowan Wright*</u>
                                         ELIZABETH COWAN WRIGHT
                                         United States Magistrate Judge