UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CIVIL NO. 17-3690(DSD/ECW)

Regents of the University
of Minnesota,

        Plaintiff,

v.                             **ORDER**

United States of America; and
E.I. du Pont De Nemours and Company,

        Defendants.


      Rick E. Kubler, Esq., Richard C. Landon, Esq. and Lathrop GPM LLP, 80 South 8th Street, Suite 500, IDS Center, Minneapolis, MN 55402 and Brian J. Slovut, Esq., University of Minnesota, Office of the General Counsel, 200 Oak Street SE, Suite 360, Minneapolis, MN 55455 counsel for plaintiff.

      Friedrich A.P. Siekert, United States Attorney's Office, 300 South 4th Street, Suite 600, Minneapolis, MN 55415; Phillip R. Dupre and Lauren Denise Grady, DOJ-ENRD P.O. Box 7611, Washington, DC 20044, counsel for defendant United States of America.

      John McGahren, Esq. and Morgan Lewis & Bockius LLP, 502 Carnegie Center, Princeton, NJ 08540 counsel for defendant E.I. du Pont De Nemours and Company.


      This matter is before the court upon various motions by the parties, including the motions to exclude the expert testimony of David Heidlauf (joined by defendant E.I. du Pont De Nemours and Company (DuPont)), for partial summary judgment prohibiting recovery of certain costs under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (joined by DuPont), for summary judgment under CERLA Section 107 by defendant

United States of America (Government); and the motions to exclude the expert testimony of Wiley Wright and Robert Zoch, for partial summary judgment, and to correct the record by plaintiff Regents of the University of Minnesota (University).

Based on a review of the file, record, and proceedings herein, and for the following reasons, the court grants the University's motion for partial summary judgment, denies the University's motion to exclude expert testimony as moot, denies without prejudice the University's motion to correct the record, denies defendants' motions for partial summary judgment, and denies without prejudice defendants' motion to exclude expert testimony.

## BACKGROUND

This dispute arises out of competing cost recovery claims under CERCLA and the Minnesota Environmental Response and Liability Act (MERLA) following investigations into releases of hazardous substances at the Gopher Ordinance Works (GOW), a World War II ordinance facility.

### I.   The GOW

The GOW was located on 13,600 acres of land in Rosemount, Minnesota, was owned by the Government and was designed, built, and operated by DuPont to produce smokeless cannon and rifle powder, oleum and other materials used in the manufacture of smokeless powder. ECF No. 124, at 2. Between November 1944 and

2

August 1945, DuPont produced an estimated 29 million pounds of smokeless powder, 80 million pounds of oleum and 51 million pounds of nitric acid at GOW.  Id.

After the war, the Government declared the GOW surplus property and transferred portions of the property to the University through two quitclaim deeds: the first transferring a 4,687-acre parcel in 1947, and the second transferring a 3,320-acre parcel containing most of GOW's buildings, infrastructure, and equipment in 1948.  ECF No. 124, at 2-3.  The parties have stipulated that the approximately 8,000 acres of former GOW property acquired by the University in these two quitclaim deeds constitute the "Site," which is a "facility" within the meaning of Section 101(9) of CERCLA.  ECF No. 181 ¶ 1.  This includes the western portion of the Site now being mined for sand and gravel, which is referred to herein as the UMore Mining Area or UMA.

In the mid-1980s, Congress passed the Defense Environmental Restoration Act, 10 U.S.C. § 2701, et seq. (DERA).  Under DERA, the Department of Defense (DoD) is required to

> carry out (in accordance with the provisions of this chapter and CERCLA) all response actions with respect to releases of hazardous substances or pollutants or contaminants from each of the following: ... (B) Each facility or site which was under the jurisdiction of the Secretary and owned by, leased to, or otherwise possessed by the United States at the time of actions leading to contamination by hazardous substances or pollutants or contaminants.

10 U.S.C. § 2701 (c)(1). Sites that were formerly owned, leased, or possessed by DoD are referred to as Formerly Used Defense Sites or FUDS.

Pursuant to a Defense and State Memorandum of Agreement with DoD, MPCA has overseen FUDS Program activities in Minnesota at all times relevant to this matter. See ECF No. 203-2 (describing the Memorandum of Agreement).

In October 1999, the United States Army Corps of Engineers (USACE) submitted an Inventory Project Report (INPR) concerning the GOW to the MPCA that listed GOW as a FUDS and acknowledged that several areas of the Site had not been fully investigated and therefore required further study. ECF No. 176, at 4.

In November 1999, MPCA provided written comments to the INPR and requested that USACE investigate the Site and perform a Phase I Site Assessment of the GOW "to aid in the design of an effect [sic] field program to evaluate potential impacts this FUDS may pose to human health and the environment." ECF No. 203-1, at 4. USACE did not perform the Phase I Site Assessment.

## II.  MPCA's Investigation Requests

In May 2001, MPCA notified the University of its intention to require USACE to complete a full investigation of GOW. ECF No. 203-2. MPCA stated its "focus is making sure that the USACE fulfills its obligations to investigate the GOW and remediate any releases that may be found." Id. USACE refused to investigate

4

the Site, claiming the University assumed that responsibility in the 1948 quitclaim deed and because the University and DuPont were also Potentially Responsible Parties (PRPs).  Id.

Because USACE refused to do so, the University agreed in late 2002 to join with MPCA and Dakota County to perform a preliminary environmental investigation of former GOW operational areas.  The University retained Peer Environmental and Engineering Resources, Inc. (PEER) to perform this study.  PEER's report confirmed the presence of GOW-era releases of hazardous substances in several areas of the Site in excess of regulatory criteria.  ECF No. 204-14, at 12-13.

In November 2003, MPCA and the University met with USACE representatives to discuss the preliminary environmental investigation, and the MPCA again requested that the Government fully investigate the Site.  In response, USACE initially identified several environmental projects it would complete at the Site.  ECF No. 203-3.  However, on September 18, 2004, USACE changed course and declined to complete any investigation, again citing to the language in the 1948 quitclaim deed.  ECF No. 203-4, at 5.

In 2006, USACE performed a limited Preliminary Assessment (PA), which was a study looking only at the 1947 parcel in order to determine whether DoD may have responsibility for releases of hazardous substances during DoD's ownership or operation of the

Site but did not investigate other activities at the Site.  ECF No. 199-13, at 57:19-58:9.  Although the PA did not investigate University activities, and although the draft final version of the PA that was submitted to the MPCA included no references to the University or post-GOW activities, see ECF No. 199-7, at 65:8-12, the final version of the PA added references to the University in its executive summary in an attempt to support the University's potential status as a PRP.[1]

On January 4, 2006, MPCA sent correspondence to USACE with comments on the PA and USACE's refusal to fully investigate the Site, stating that "the owner and/or operator of GOW, in this case the Federal Government, would be considered a responsible party for environmental contamination found at the site," regardless of the language found in the historical deed or property transfers, and that "it is MPCA's position that the Corps must fully investigate the nature and extent of contamination to all media associated with all aspects and areas of the GOW operation."  ECF No. 203-6.  USACE again rejected MPCA's request for a full investigation of the Site.  ECF No. 203-7.

---

[1]  The PA did not advance response actions at the Site, but rather "advanced the Corps in its prioritization of funding."  ECF No. 199-8, at 153:13-154:14.

## III. USACE's Environmental Studies

After continued pressure from MPCA and Minnesota's Congressional delegation, USACE completed a Focused Site Inspection Report for the 1947 parcel (FSI), a limited PA for the 26.7-acre Steam Plant parcel (Limited Steam Plant PA), and an Expanded Site Inspection Report (ESI). See ECF No. 203-6 (requesting additional investigation); ECF No. 199-8, at 168:4-17 (identifying Congressional pressure as reason for additional investigation). USACE admitted its objectives for the FSI and ESI were to "support the Department of the Army (DA) with PRP determination and closeout of eligible areas in a timely manner." ECF No. 203-10. USACE nevertheless continued to refuse to conduct any investigation of the 1948 parcel.

In commenting on the draft FSI, MPCA noted, "as the MPCA has previously stated to the Corps, a full and complete Remedial Investigation/Feasibility Study (RI/FS) is necessary for the entire GOW site, regardless of when the property transfer took place." ECF No. 203-11. MPCA also stated that "this investigation does confirm previous data collected by the MPCA which documents releases of hazardous substances has [sic] occurred at the Site, and those releases are attributable to GOW operations." Id.

After USACE finalized the ESI report, in early 2010, it announced no further FUDS funds would be spent at GOW, except to defend claims against the DoD. ECF No. 203-15.

In a May 28, 2010, response to the ESI, MPCA noted it is the lead regulator for Superfund investigations in Minnesota, that USACE did not provide any opportunity for MPCA to review and comment on the USACE's sampling plan for the ESI and identified several perceived shortcomings of the ESI. ECF No. 203-16. MPCA stated that "the ESI again documented releases of hazardous substances to the environment as a result of GOW operations under … [DoD] ownership, and determined that additional investigations are warranted." Id. The MPCA again requested that USACE complete a full RI/FS of the entire Site. Id.

Months later, USACE's legal counsel responded to MPCA's comments on the ESI, advising MPCA that:

> The ... [FUDS] Program is limited to addressing contamination resulting from ... DoD activities. The FUDS Program may not assume responsibility released by other parties nor can it relieve the terms under which the property was transferred. To determine DoD responsibilities at a FUDS, the Army reviews historical documents of DoD property use and transfer documents and conducts limited investigations.

ECF No. 203-17. USACE's lawyer then suggested that "other parties should take responsibility for further investigations that may be necessary." Id. It is undisputed that USACE did no further work at the Site after 2009.

In November 2009, Minnesota Congressman John Kline wrote to the Department of the Army asking that USACE perform an RI of the 1948 parcel. ECF No. 203-14. After a meeting at Congressman

Kline's office in March 2010, USACE maintained its position that the University or DuPont should complete the RI: "[T]he Army cannot commit to initiating a ... [DoD] led cleanup under the ... [FUDS] Program of the GOW property for several reasons as discussed during the March 2 meeting.  The Army is, however, willing to enter into discussions with the UMN under appropriate circumstances regarding the legal issues between the United States, UMN and other potentially responsible parties."  ECF No. 203-15.

## IV.  The University's Initial RI Activities

Because of USACE's refusal to conduct the full RI, pressure from the MPCA fell on the University, as the current owner of the property, to complete that investigation.  In May 2008, the University issued a Request for Proposals (RFP) for an environmental consultant to perform a Remedial Investigation and Feasibility Study of the entire Site.  ECF No. 220-1.  After a competitive bidding process, the University selected Barr Engineering Company (Barr) to complete the work and entered into a Master Service Agreement (MSA) with Barr in August 2008.  ECF No. 206-7, at UMNR00195010.  The MSA required Barr to complete the RI/FS of the entire Site.  Id.

Although Barr's work would eventually address the entire Site, MSA Work Order #1, dated September 8, 2008, defined the initial area for RI study as the UMA.  ECF No. 220-2; ECF No. 220-4, at 22:1-23:16.

Work Order #1 directed Barr to prepare an RI Work Plan and supporting documents that would "satisfy the requirements of" CERCLA, MERLA and the National Contingency Plan (NCP). ECF No. 220-2, at 5. The supporting documents required in Work Order #1 for the RI included a Quality Assurance Project Plan (QAPP), a Sampling and Analysis Plan (SAP), and a Health and a Safety Plan (HASP). Id. Preparation and use of each of these supporting documents is required to comply with CERCLA, MERLA, and the NCP. ECF No. 205-1, at 25.

The RI work completed by Barr from 2008 to 2010 included the Phase II Investigation, Sites of Concern (SOCs) 1-3 and 6-8 (Phase II), the Supplemental Site Inspection (SOC 4) and Remedial Investigation (SOC 5) (SSI/RI), the Groundwater Assessment, and the Ancillary Use Facility Investigation. See ECF No. 204-14, at UMP024932, UMP024936; ECF No. 205-1, at 20-22.

The University has submitted testimony from its expert, David Heidlauf, a hydrogeologist with over 35 years' experience in managing Superfund site investigations and cleanups, who opines that the studies completed by Barr between 2008 and 2010 were "necessary" and complied with CERCLA, the NCP, and MERLA. ECF No. 205-1, at 15-16, 20-22. It is undisputed that these Barr studies

were cited and relied on in the final RI.  ECF No. 204-14, at UMP024925–24936.[2]

### A.   Groundwater Assessment

The Government and DuPont argue that the Groundwater Assessment was prepared in support of an Environmental Impact Statement (EIS) for a mining project located at the UMA, and therefore is not recoverable as a necessary or reasonable response cost under CERCLA.  ECF No. 189, at 12.

The University entered into a separate MSA Work Order #2 with Barr to prepare a Groundwater Assessment Work Plan.  ECF No. 220-3.  Work Order #2 expressly contemplated that the data generated in the Groundwater Assessment would be used in the RI: "[Barr] ... is preparing a Remedial Investigation Work Plan (RI Work Plan) under Work Order #1 to be completed concurrently with the EIS Groundwater Assessment Work Plan.  Installation of the monitoring wells and associated sampling and data collection will be addressed in future contact work orders, and shall be completed in accordance with the requirements of the Quality Assurance Procedures Plan to be prepared by ... [Barr] under Work order #1."  Id.

The Groundwater Assessment was performed under a November 11, 2008, work plan submitted to the MPCA.  ECF No. 190-3.  The

---

[2]  A breakdown for costs of Barr's studies is included at ECF No. 227-2, at 37.

Groundwater Assessment involved installation of a network of monitoring wells within and outside the UMA, measurement of groundwater elevations and collection of other Site-wide hydrogeologic data. Id. Barr issued the final Groundwater Assessment Report on June 30, 2009. See ECF No. 205-1, at 5-6.

Barr relied on, cited to, and referenced the Groundwater Assessment in the Phase II, [ECF No. 220-12, at UMP007224-25, 07236, 07243], the SSI/RI, [ECF No. 220-14, at UMP018120-21, UMP018148], the Remedial Investigation of UMore East, [ECF No. 220-19, at UMP013326, UMP013330, UMP013335, UMP013338-39, and UMP013413], and the Remedial Investigation of UMore Park/GOW, [ECF No. 204-14, at UMP02924, UMP024932-33, and UMP024985], regarding hydrogeologic conditions and the groundwater flow regime across the Site.

The University has presented testimony that the study of hydrogeological conditions in the Groundwater Assessment were necessary for a full characterization of the Site, as required under the NCP, CERCLA, and MERLA, and that the RI would have been incomplete without it. ECF No. 205-2, at 60:2-61:1.

In challenging the necessity of the Groundwater Study, defendants argue that the study "did not investigate the presence of CERCLA hazardous substances associated with historical operations at the Site." ECF No. 212-4, at 2, 13 -14. Defendants do not, however, identify evidence that the RI could have been

completed in compliance with MERLA, CERCLA, and the NCP without fully assessing the hydrogeological conditions at the Site, as was done in the Groundwater Assessment.  See ECF No. 205-1, at 10; ECF No. 205-2, at 60:2-61:1 (stating that a full hydrogeologic assessment is a required element of an RI).

**B.   Phase II Environmental Site Assessment**

The Government and DuPont argue generally that the Phase II investigation by Barr was also meant to support the EIS rather than the RI, [ECF No. 189, at 12-14], but they have not challenged that it was incorporated in and relied on in the RI or submitted evidence that the RI could have been completed without it.

The Phase II work plan was prepared "to address possible subsurface environmental impacts resulting from previous activities in the UMA.  The Plan has been developed to be consistent with the National Continency Plan (NCP) requirements and will be administered under the authority of the MPCA Superfund Program."  ECF No. 220-6, at UMP004297.  The MPCA reviewed and commented on prior drafts of the Phase II work plan.  ECF No. 220-7; ECF No. 220-8.  The MPCA directed that "a full and complete Superfund Remedial Investigation is needed for the UMore Park/GOW site/property."  ECF No. 220-8.

Based on comments by MPCA and Dakota County, the University submitted a revised Phase II work plan to MPCA for review and approval on May 1, 2009.  ECF No. 220-6, at UMP004295.  The MPCA

also provided several rounds of comments on the QAPP and SAP developed for the Phase II investigation. ECF No. 220-9; ECF No. 220-10. MPCA approved the Phase II work plan on June 16, 2009. ECF No. 220-11.

Barr completed the Phase II investigation and submitted the Report to MPCA on November 12, 2009. ECF No. 204-14, at UMP024932. MPCA reviewed and provided technical comments to the Phase II Investigation Report on February 24, 2010, concurring with Barr's findings. ECF No. 220-13.

### C.   Supplemental Site Inspection

The Government and DuPont similarly challenge the SSI/RI as prepared for the support of the EIS rather than the RI, but again present no evidence that it was not incorporated in and relied on in the RI or that the RI could have been completed without it.

The University submitted the SSI/RI work plan to MPCA for review on June 25, 2009. See ECF No. 220-15 (approving June 25, 2009 Work Plan). The purpose of the SSI/RI was "to evaluate the nature and extent of environmental impacts related to operations that occurred at the subject SOCs during and after operation of the former Gopher Ordnance Works (GOW)." ECF No. 220-14, at UMP005477. MPCA approved the SSI/RI work plan on August 12, 2009. ECF No. 220-15.

Barr completed the field work and submitted the SSI/RI Report to MPCA on January 12, 2010. ECF No. 220-16. MPCA reviewed and

commented on the SSI/RI report on March 11, 2010, concurring with the findings and stating that further investigation and other response actions would be necessary in the future.  ECF No. 220-27.

### D.   AUF Investigation

The University also completed a Preliminary Subsurface Investigation, Ancillary Use Facility, UMore Mining Area (AUF Investigation).  The AUF Investigation was performed under a work plan that was submitted to and reviewed by the MPCA.  ECF No. 220-17.  The AUF work plan was developed to "evaluate six areas of concern identified for the AUF. The AUF will include test trenching excavations and the collection of soil samples for laboratory analysis."  Id.  The AUF Investigation incorporated the field and sampling methods from the QAPP and SAPs for the Phase II and SSI/RI.  Id.  The AUF Investigation Report was submitted to MPCA on May 11, 2010.  ECF No. 220-18.

### V.   The University's RI Work From 2011-2017

In March 2011, the University advised MPCA that because USACE refused to do so, it would complete a RI of the 1948 parcel, but reserved all of its rights to pursue cost recovery from USACE.  ECF No. 203-18.  MPCA hosted a public meeting on May 19, 2011, to review the University's draft RI work plan.  ECF No. 203-19.  The University issued its final RI for the 1948 Parcel in February 2012, finding that "[t]he areas with the greatest environmental

15

impacts appear to be consistent with the historical operations of the GOW." ECF No. 203-22. MPCA agreed. ECF No. 203-23.

The MPCA then asked the University and USACE to enter into a Cooperative Cleanup Memorandum Agreement (CCMA) to address future investigation and cleanup of the Site. ECF No. 203-24. The University agreed to do so if USACE was also a signatory to the CCMA. ECF No. 204-6. USACE, however, refused and again invited the University to file a lawsuit. ECF No. 204-1. USACE's lawyer told MPCA that opening the PRP Project for the Site was for done "for management purposes and to defend claims against the Department of Defense." ECF No. 203-25.

In October 2013, Minnesota Governor Mark Dayton wrote to Secretary of the Army John McHugh, stating Minnesota's "longstanding concern about the polluted condition of the GOW site," and requested that Secretary McHugh direct USACE to enter an agreement with the University and MPCA to complete the necessary steps to address the pollution. ECF No. 204-2. The Army refused. ECF No. 204-4.

On November 5, 2013, the MPCA issued a Commissioner's Notice Letter (CNL) identifying the University and USACE as PRPs, and threatening issuance of a formal Request for Response Action (RFRA) and potential civil penalties if they did not enter into a CCMA to complete the RI. ECF No. 204-5. The MPCA later sent a similar CNL to DuPont. ECF No. 204-7.

16

Around that time, MPCA again directed the parties to complete the RI.  ECF No. 204-3.  MPCA later agreed to delay issuing a RFRA if a party would agree serve as lead for conducting a RI.  ECF No. 204-8.  The University agreed to lead the RI because USACE refused to do so.  ECF No. 204-9.

USACE made its position clear on its role in the RI process, stating through its lawyer that "USACE is not conducting this RI, or working jointly with the U of M in preparation of the RI."  ECF No. 204-10.  Further, USACE "will not participate in public meetings on the RI work by the U of M and does not anticipate meeting with the MPCA regarding the RI work by the U of M unless requested to do so by the MPCA for the public benefit."  Id.  USACE explained that its "technical role in this RI is limited to offering suggestions and recommendations, but not to making decisions or implementing actions."  Id.  As a result, USACE disclaimed any "decision authority" over the RI work.  Id.

The University submitted its RI work plan to MPCA in April 2016.  MPCA requested public comments and hosted a public meeting in June 2016 to review the work plan, and then approved it.  ECF No. 204-11.

The University conducted the RI in 2016 and issued the final RI Report in May 2017 (2017 RI).  ECF No. 204-14.  The 2017 RI documented releases of hazardous substances at the Site that

17

resulted from former GOW activities.  Id. at 61-64; see also ECF No. 204-13.

USACE reviewed the 2017 RI Report and submitted comments to MPCA in June 2017, expressing concerns about compliance with CERCLA and the NCP.  ECF No. 204-15.  MPCA disagreed, stating that the 2017 RI "met the requisite MPCA Superfund guidelines," which are "consistent with Federal Superfund Guidelines."  ECF No. 204-17. MPCA also noted it was perplexing and inconsistent that USACE decided to comment on the 2017 RI while "simultaneously limit[ing] its involvement in completing necessary RI activities at the Site." Id.  The MPCA observed that USACE's comments appeared to "focus on determining levels of responsibility for releases instead of on technical aspects of the ... [2017 RI] Report."  Id.

On August 10, 2017, MPCA expressly authorized the performance of removal and remedial actions by the University in response to the release of hazardous substances at the Site, including the "completion of the remedial investigation activities taken by the University between 2002 and 2016, collectively comprising the Remedial Investigation."  ECF No. 204-16.  MPCA "determined that the approved response actions taken by the University to date were reasonable and necessary in response to the release or threatened release of hazardous substances, pollutants or contaminants at the Site ...."  Id.  The MPCA approved the 2017 RI Report on October 31, 2017.  ECF No. 204-18.

MPCA requested that USACE and the University perform a Feasibility Study (FS) to determine appropriate response actions for the identified release of hazardous substances at the Site. ECF No. 204-18; ECF No. 204-19. The Government refused, purportedly due to this pending litigation and suggested that MPCA look to the University to complete the FS. ECF No. 204-20. The University contracted with Barr Engineering to complete the FS in November 2021. ECF No. 204-21. The FS, which will initially address four areas of concern in the north-central portion of the Site, is ongoing with MPCA oversight.

## VI. Summary of the University's Stated Response Costs

Since 1999, the MPCA repeatedly stated that a complete RI was necessary at the Site. ECF Nos. 203-1, 5, 6, 9, 11, 16, 20, 24, and ECF No. 204-5. Between 2002 and 2017, the University completed thirteen studies comprising the RI and performed related response action activities for which it now seeks cost recovery. See ECF No. 204-14, at 8-20; ECF No. 205-1, at 4-13.

The University's studies were performed consistent with MPCA-approved work plans and supporting documents. ECF Nos. 203-12, 203-13, 203-21, 204-11, and 204-12. The MPCA determined that the 2017 RI work plan met "MPCA Superfund Program guidance established under ... [MERLA] and is consistent with the U.S. EPA Superfund Program guidance for completing Remedial Investigations under ... [CERCLA]." ECF Nos. 204-11, 204-12.

Although not required for initial investigations, the University has put forth evidence that the studies were prepared consistent with the NCP, CERCLA, and MERLA. ECF No. 204-13, at 3, 8, 66; ECF No. 205-1, at 18-23. These investigations were specifically called for in the NCP to investigate a site to determine whether a release has occurred, sources of the release, the contaminants of concern, the exposure pathways, what potential risk or real risk exists, information necessary to evaluate remedial alternatives and selection thereof. ECF No. 205-2, at 53:13-19.

The MPCA has issued determination letters approving the response actions in question. In particular, the MPCA noted on August 10, 2017, that "[t]he approved response actions include completion of the remedial investigative activities taken by the University between 2002 and 2016, collectively comprising the Remedial Investigation." ECF No. 204-16. According to the MPCA, these response actions "were reasonable and necessary in response to the release or threatened release of hazardous substances, pollutants or contaminants at the Site ...." Id.

The Government and DuPont argue that the August 10, 2017, letter does not specify which studies are approved. ECF No. 211, at 11. But it is undisputed that the RI itself identified the studies that it relied on — including all of the studies for which the University is seeking to recover in this action — and that the

20

MPCA reviewed and approved the final RI.  The MPCA explicitly rejected comments from USACE that questions whether the final RI complied with the NCP.  ECF No. 204-17.  Defendants have not established that the MPCA did not approve of any of the specific studies in question.

The University incurred $3,361,215.61 in completing the RI.  See ECF No. 206 ¶¶ 4, 8; ECF No. 204-22; ECF No. 231.  All the contracts, invoices, and evidence of payment to University contractors are attached to the Prytz Declaration.  See ECF No. 206.  Two additional invoices not directly paid by the University were also submitted to the court.  ECF Nos. 204-21, 204-22.  The University has established that it incurred all of these expenses based on records were kept by the University in the ordinary course of business.  ECF No. 206 ¶¶ 3-5.

**VII. Mining Lease**

The Government and DuPont argue that some of the costs sought by the University should not be allowed in this case because those costs were already reimbursed through a mining lease involving the western portion of the Site known as the UMA.  ECF No. 189, at 14.

The University executed a Mining Lease on June 8, 2011, with Dakota Aggregates, which allowed Dakota Aggregates to mine sand and gravel at the UMA.  ECF Nos. 220-21, 220-22.  Under that lease, Dakota Aggregates agreed to pay a monthly production royalty to the University based on the sand and gravel mined from the Site.

In Sections 3.3 and 3.4 of the lease, Dakota Aggregates agreed to advance to the University $1,382,931.96 in costs the University had incurred for environmental development, engineering, and legal expenses between May 1, 2009, and June 8, 2011, the Effective Date of the Lease.

Section 3.4 of the lease is titled "Expense Reimbursement," which provided that Dakota Aggregates would "reimburse" the University for costs "paid or incurred by University in connection with completion and approval of the environmental impact statement" for sand and gravel mining. ECF No. 220-21, § 3.4 at UMNR0033466. The lease also explained in Section 3.3(c) that these payments "shall be credited as an advance payment of future Production Royalty payments," to be paid at 25% of the monthly royalties owed. Id. § 3.3(c) at UMNR0033465.

It is undisputed that the $1,382,931.96 paid by Dakota Aggregates included $732,695.85 in charges for investigation work performed by Barr for which the University is seeking cost recovery in this action. ECF No. 220-24. It is also undisputed that all of the amounts owed to Dakota Aggregates under §§ 3.3(c) and 3.4 of the lease, including the $732,695.84 at issue, were repaid in full as of April 2020. ECF No. 220-26. As such, the evidence demonstrates that the University has borne the full cost of the environmental response activities at issue in the case.

Although The Government and DuPont identify various references in the lease and related communications to the word "reimbursement," the record establishes that the University understood the payment by Dakota Aggregates to be an advance of royalties that would be paid back over time.  ECF No. 220-4, at 47:22–49:5; ECF No. 220-5, at 63, 66, 67, 68, 73, 77–78, 78–79, 80; ECF No. 220-25.

## VIII. Summary of the Government's Costs

The Government claims to have incurred response costs in the as follows:  $779,927.27 in internal USACE costs from 2000–2021; $812,276.45 in contractor costs; and $90,249.40 in attorney's fees.[3]

It has offered evidence including internal time records, an expert report from accountant Wiley Wright, and an expert report from accountant William Kime to support its claim.  See ECF Nos. 195-1, 195-2, and 195-4.

Although USACE time records indicate that employees recorded time under a GOW-related code, the Government has not presented evidence, by employee affidavit or through any contemporaneous time records, that the work being performed was actually in response to a release or threatened release at the Site.

---

[3] The parties' dispute regarding the amount of prejudgment interest on the Government's costs will be addressed by the corut at a later time.

USACE's records do not identify and separate response costs when time is recorded and do not identify detail about work performed. See ECF No. 199-8, at 144:4-15, 163:14-15. Any effort to segregate costs is conducted via an informal process. ECF No. 199-6, at 24:17-25:13.

USACE has offered an affidavit of employee John Phelps, who sometime after this case was filed in 2017 began attempting to identify which of USACE's internal costs were response costs. ECF No. 195-6. USACE estimated the number of hours worked that may not have been response costs—either because it was related to investigation into indemnification issues for the 1948 parcel, related to communications with Congressional delegations about the property, or responding to the MPCA regarding requests for a full investigation—and removed those estimates from the total labor costs. ECF No. 199-11. Phelps admits that these post hoc adjustments were estimates, and he could not "venture a guess on how close or how far it is in estimation." ECF No. 199-8, at 162:24-163:22.

## IX.  This Case

On August 11, 2017, the University commenced this suit seeking damages and declaratory relief from the Government and DuPont under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and from DuPont under MERLA. On November 17, 2017, the Government answered the complaint and filed

24

counterclaims alleging that (1) the University breached the 1948 Deed and 1948 Contract by seeking reimbursement for environmental response costs and failing to indemnify the Government against all lawsuits and claims relating to the 1948 Parcel; (2) the University should be apportioned at least some of any response costs found to be due under CERCLA; and (3) the University should be held liable for all response costs incurred or that may be incurred in connection with the Site. Answer and Countercl. ¶¶ 106-22. DuPont answered the complaint, but did not file counterclaims or cross-claims.

The Government moved for partial judgment on the pleadings as to its defense to the University's CERCLA claim relating to the 1948 Parcel and its breach-of-contract counterclaim. The Government specifically requested that the court hold that the University is not entitled to recover its response costs relating to the 1948 Parcel and that the University is obligated to indemnify and hold harmless the Government for all past, current, and future response costs relating to the 1948 Parcel. The court denied the motion, concluding that the parties' agreement is ambiguous insofar as the indemnification provision is concerned. ECF No. 57, at 7 (citations omitted). The court noted that it would be better positioned to assess the scope of the indemnification provision when presented with relevant extrinsic evidence. See id. (concluding that "whether environmental

25

liability is included cannot be determined on the present record absent additional factual development"). After engaging in discovery, the parties filed the cross motions for partial summary judgment relating to the Government's counterclaim for breach of contract based on the indemnification provision and its corresponding affirmative defense. The Government also sought a determination that the University is precluded from recovering environmental response costs for which is has already been reimbursed. The court concluded that the indemnification provision did not indemnify the Government from environmental liability and also deferred determination on the double-recovery issue. ECF No. 124, at 18.

The only issue before the court in the present summary judgment motions, therefore, is to determine whether and to what extent the University and the Government have incurred response costs that are recoverable under CERCLA and MERLA. The court will determine the allocation of the total response costs to each party after trial.

## DISCUSSION

### I.   Liability and Cost Recovery Under CERCLA

The University has brought a cost recovery action under CERCLA § 107 against the Government and DuPont. ECF No. 1. The Government

has asserted counterclaims for cost recovery against the University under CERCLA §§ 107 and 113, respectively. ECF No. 24.

CERCLA establishes strict liability, covering "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). To establish CERCLA liability, a plaintiff must prove that "a defendant is within one of the four classes of covered persons enumerated in subsections (1) through (4); that a release or threatened release from a facility has occurred; that the plaintiff incurred response costs as a result; and that the costs were necessary and consistent with the national contingency plan." Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930, 934 (8th Cir. 1995).

Where the response costs are incurred by an enumerated sovereign entity, "CERCLA provides that responsible persons are liable for 'all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the National Contingency Plan [NCP].'" State of Minn. v. Kalman W. Abrams Metals, Inc., 155 F.3d 1019, 1023 (8th Cir. 1998), quoting 42 U.S.C. § 9607(a)(1)-(4)(A).

The parties have already stipulated that the Site is a "facility" under CERCLA, [ECF No. 181 ¶ 1], there has been a "release" of "hazardous substances" from that facility, [ECF No.

181 ¶ 2], and all parties fall within one or more of the classes of responsible persons, [ECF No. 181 ¶ 3.]

As with the CERCLA claim, the University and DuPont have stipulated under MERLA that the Site is a facility, [ECF No. 181 ¶ 4], there was a release or threatened release of a hazardous substance at the Site [ECF NO. 181 ¶ 5], and that the University and DuPont are liable under MERLA, [ECF No. 181 ¶¶ 6-7].  The focus of this order, thus,  is whether and to what extent the University and the Government have incurred recoverable response costs under CERCLA and MERLA.

Section 107 of CERCLA provides for the recovery of costs that a government or private party incurs in responding to the release of hazardous substances. Responsible "persons" are liable for

> (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; [and]

> (B) any other necessary cost of response incurred by any other person consistent with the national contingency plan ....

42 U.S.C. §§ 9607(a)(2), (a)(4)(A)-(B).

CERCLA cost recovery often hinges on compliance with the NCP, which identifies methods for investigating the environmental and health problems resulting from a release and criteria for determining the appropriate extent of response activities. Matter of Bell Petroleum Servs., Inc., 3 F.3d 889, 894 (5th Cir. 1993).

Initial preliminary investigations, however, typically do not require consistency with the NCP where there has not yet been a selection of remedies for the site. See Foster v. United States, 926 F. Supp. 199, 203 (D.D.C. 1996) ("Because the detailed NCP provisions governing other response action cannot reasonably be applied to preliminary monitoring and evaluation of a release of hazardous substances, investigatory costs are generally recoverable irrespective of their consistency with the NCP."); Gache v. Town of Harrison, N.Y., 813 F. Supp. 1037, 1046 (S.D.N.Y. 1993) ("Courts have held that initial preliminary investigatory and monitoring costs are recoverable irrespective of the recoverability of other response costs or compliance with the requirements of the [NCP]."); CNH Am., LLC v. Champion Env't Servs., Inc., 863 F. Supp. 2d 793, 809 (E.D. Wis. 2012) ("[M]any courts have held that initial investigation, site-assessment, and monitoring costs are recoverable under § 107(a) of CERCLA irrespective of compliance with NCP requirements."); Spectrum Intern. Holdings, Inc. v. Universal Cooperatives, Inc., No. 04-99, 2006 WL 2033377 (D. Minn. July 17, 2006) (noting that a plaintiff "may be entitled to recovery of investigative and monitoring costs without regard to NCP compliance.").

## II.  Liability and Cost Recovery Under MERLA

The University has brought cost recovery claims against DuPont under MERLA.  The liability provision of MERLA provides:

> [A]ny person who is responsible for a release
> or threatened release of a hazardous substance
> from a facility is strictly liable, jointly
> and severally, for the following response
> costs and damages which result from the
> release or threatened release or to which the
> release or threatened release significantly
> contributes:
>
> (a) All reasonable and necessary response
> costs incurred by the state, a political
> subdivision of the state or the United States;
>
> (b) All reasonable and necessary removal costs
> incurred by any person . . . .

Minn. Stat. § 115B.04, subdiv. 1.  MERLA defines "response" costs

to include "remove, removal, remedy, and remedial action."  Minn.

Stat. § 115B.02, subdiv. 18.  In turn, the definition of "removal"

includes in relevant part:

> (2) necessary actions taken in the event of a
> threatened release of a hazardous substance,
> or a pollutant or contaminant, into the
> environment;
>
> (3) actions necessary to monitor, test,
> analyze, and evaluate a release or threatened
> release of hazardous substance, or a pollutant
> or contaminant;
>
> [and]
>
> (5) other actions necessary to prevent,
> minimize, or mitigate damage to the public
> health or welfare or the environment, which
> may otherwise result from a release or
> threatened release.

Minn. Stat. § 115B.02, subdiv. 17(a).

To establish recoverable costs under MERLA, the University

must show it incurred reasonable and necessary costs, which are

those needed to "minimize the damage to the public health and welfare of the environment." Musicland Group, Inc. v. Ceridian Corp., 508 N.W.2d 524, 533 (Minn. Ct. App. 1993).

Although MERLA does not define the terms "reasonable" or "necessary," cases applying this standard specifically address parties that were acting pursuant to instructions from the MPCA and hold that the costs "incurred to implement the remedy set forth" by the agency are reasonable and necessary. Kennedy Bldg. Assocs. v. CBS Corp., No. 99-1833, 2010 WL 3024714, at *2 (D. Minn. Aug. 2, 2010); Minnesota ex rel. N. Pac. Ctr., Inc. v. BNSF Ry. Co., No. 08-6385, 2011 WL 13201773, at *5 (D. Minn. Aug. 25, 2011), aff'd, 686 F.3d 567 (8th Cir. 2012) (describing the "reasonable and necessary" conclusion in Kennedy Bldg. Assocs. as "eminently fair and consistent with the purposes of MERLA.").

## III. The University as the State

The University is an institution of higher education created by charter and perpetuated by the Constitution of the State of Minnesota, Art. XIII, § 3, and is an instrumentality of the State of Minnesota. See, e.g., Bd. Of Regents of Univ. of Minn. v. Reid, 522 N.W.2d 344, 346 (Minn. Ct. App. 1994) (stating that the University "is a constitutional arm of Minnesota government.").

As an instrumentality of the State of Minnesota, the University therefore qualifies as the "State" for the purposes of CERCLA § 107(a)(4)(A), and benefits from the presumption that

31

response costs are consistent with the NCP.  See, e.g., Wash. State Dep't of Transp. v. Washington Nat. Gas Co., Pacificorp, 59 F.3d 793, 800- 01 (9th Cir. 1995) (acknowledging that the WDOT was an instrumentality of the state, and therefore was the "State" for purposes of § 107 and benefited from the presumption of consistency with the NCP).

The Government and DuPont argue that the University is not an instrumentality of the State, but is instead a "political subdivision," which is excluded from the definition of "State" under CERCLA, and therefore not subject to the presumption that response costs are consistent with the NCP. This argument fails because the Minnesota Supreme Court has ruled that the University is not a political subdivision of the State. Winberg v. Univ. of Minn., 499 N.W.2d 799 (Minn. 1993).  Although Winberg dealt specifically with a different statutory scheme, its reasoning — that the University does not have the power to tax and is a constitutional arm of the state — applies equally here.

Defendants also argue that the MPCA's August 10, 2017, [ECF No. 204-16], authorization states that the University is a "political subdivision" under MERLA because it invokes Minn. Stat. § 115B.17, subdiv. 12, which provides authorization for "permitting a political subdivision or private person to recover response costs."  But this argument misrepresents the evidence. The MPCA's letter states that it is authorizing performance of

32

removal and remedial actions under that statute "to the extent necessary." ECF No. 204-16. Nothing in the letter suggests that the MPCA was offering a determination that the University is a political subdivision, and the University has not somehow conceded that it was a political subdivision by seeking such authorization on a preemptive basis and out of caution.

## IV.  The University's Response Costs

The MPCA has not yet selected what response actions will be necessary to address the identified releases of hazardous substances at the Site, but from 2002 through 2017, the University performed the initial investigation at the Site as directed and approved by the MPCA. The $3,361,215.61 in response costs incurred by the University in performing those initial investigations is recoverable under both CERCLA and MERLA because the actions were required by the MPCA and were reasonable and necessary to assess whether past Site activities resulted in a release of hazardous substances to the environment and the threat those releases pose to human health and/or the environment.

Because the detailed NCP provisions governing other response action cannot reasonably be applied to preliminary monitoring and evaluation of a release of hazardous substances, the University's costs are recoverable irrespective of their consistency with the NCP. Foster v. United States, 926 F. Supp. 199, 203 (D.D.C. 1996).

33

To the extent that any of the University's costs are required to meet NCP guidelines, the University has submitted evidence that its studies were consistent with the NCP.  ECF Nos. 204-11, 204-12, 204-13, 204-17; ECF No. 205-1, at 18-23.  Defendants argue, however, that the University's costs still must meet the "accurate accounting" requirement of the NCP and that the University's cost documentation falls short of that requirement.

Under the NCP, a party is required to provide an "accurate accounting of ... [its] costs incurred for response actions." 40 CFR § 300.160.  However, the NCP does not define "accurate accounting," nor does it further elaborate on the requirement. See, e.g., United States v. Saporito, No. 07-3169, 2011 WL 2473332, at *11 (N.D. Ill. June 22, 2011).

Courts have repeatedly held that the accurate accounting requirement does not impose any additional documentation requirements on a party beyond what is required to prove the costs by a preponderance of the evidence.  See United States v. E.I. Du Pont Nemours & Co., 341 F. Supp. 2d 215, 244-45 (W.D.N.Y. 2004). Courts have therefore held that employee affidavits and summary reports of underlying cost documentation satisfy the accurate accounting requirement.  Saporito, 2011 WL 2473332, at *11.  Some courts have concluded that the NCP does not even require that costs be supported by both an invoice and proof of payment.  See, e.g., Exxon Mobil Corp. v. United States, 335 F. Supp. 3d 889, 925 (S.D.

Tex. 2018) ("Excluding any cost that is not supported by both an invoice and proof of payment is an overly strict reading of the ... [NCP's] cost-documentation provision.").

The University submitted an affidavit from a University employee attaching contracts, detailed invoices for costs and evidence of payment related to the RI studies. ECF Nos. 206, 206-1, 206-8. The University has further summarized the same evidence in detailed discovery responses. ECF No. 206-9. This is more than adequate to comply with the NCP. The University has further submitted evidence that such evidence is consistent with what is available in other NCP response actions. ECF No. 205-1, at 22-24.

Because the University is the State, defendants bear the burden of showing that its costs are inconsistent with the NCP. State of Minnesota v. Kalman W. Abrams Metals, Inc., 155 F. 3d 1019, 1023-24 (8th Cir. 1998). Defendants have not identified any evidence that creates a material dispute of fact regarding the accuracy of the invoices and proof of payment submitted by the University. Defendants have not met their burden showing that this evidence fails to meet the "accurate accounting" requirement of the NCP or demonstrated why summary judgment would not be appropriate on this issue.

## V.   Recoverability of the University's Costs

Defendants argue that some portion of the University's costs are not recoverable based on three separate arguments: (1) that a portion of these costs were incurred in support of an Environmental Impact Statement concerning mining at the Site, and therefore not recoverable response costs; (2) that the University has already been reimbursed a portion of these costs, and therefore the University cannot recover them again in this action; and (3) that some unspecified amount of the University's costs are actually litigation expenses, and therefore not recoverable response costs.

### A.   EIS Costs

Defendants challenge costs related to four investigations completed by Barr because, according to the Government, these investigations were "associated" with the University's gravel mining EIS and therefore could not be "necessary" to complete a full RI of the Site. As addressed in the above Findings of Fact, Defendants have failed to meet their burden of submitting probative evidence to establish a material question of fact on this issue.

Although defendants argue that the purpose of the EIS itself was not to respond to a release or threatened release at the Site, the EIS is not at issue in the lawsuit.  The question before the court is instead whether the four challenged studies were necessary to assess whether past Site activities resulted in a release or

threatened release of hazardous substances and whether such a release was a threat to human health and/or the environment.

Defendants have offered no facts or authority that would support their claim that a study cannot be necessary to a CERCLA investigation if it is also associated with another unrelated study.

The Eighth Circuit has held that a party's motive is irrelevant to the issue of recoverability of costs under CERCLA. Johnson v. James Langley Operating Co., 226 F.3d 957, 963 (8th Cir. 2000) ("[T]he motives of the private party attempting to recoup response costs ... are irrelevant.").

In Johnson, the Eighth Circuit rejected an argument that clean-up costs could not have been incurred in response to a release where the plaintiff was not acting at the behest of a regulatory agency and had not incurred costs until after commencing litigation. 226 F.3d at 963. The court held that a plaintiff's intent to use the fruits of an investigation in litigation does not remove that activity from the statutory definition of "removal" under CERCLA. Id. Similarly, here, the Government's argument that the University intended to also use the fruits of the challenged activities in connection with the EIS does not remove such activities from the definition of removal. "By its terms, the statute gives no weight to the timing, purpose, or ultimate use of covered activities." Pakootas v. Teck Cominco Metals, Ltd.,

905 F.3d 565, 582 (9th Cir. 2018) (citing 42 U.S.C. § 9601(23), (25)). Further, unlike Johnson, it is undisputed that each of the four challenged studies at issue here were: 1) directed at investigating known or suspected releases of hazardous substances to the environment, and 2) were done at the "behest of a regulatory agency," MPCA, which repeatedly demanded that a full and complete RI of the entire Site—including the UMA.

Other courts agree with the objective approach in Johnson and conclude that costs incurred in a response action may still be recovered even if the action was motivated by something other than just the cleanup. See, e.g., Bd. of Trustees of Leland Stanford Junior Univ. v. Agilent Techs., Inc., No. 18-1199, 2021 WL 5710109, at *3 (N.D. Cal. Dec. 2, 2021) ("That a party might also have 'a business reason for the cleanup' does not negate necessity."). "The focus is 'not on whether a party had a business or other motive in cleaning up the property,' but is instead on whether there is an objective health threat. Id. (quoting Carson Harbor Village, Ltd. v. Unocal Corp., 270 F.3d 863 (9th Cir. 2001) (en banc)).

Here, there is no dispute that there was an objective health threat addressed by Barr's RI, that the challenged studies were completed at the request of and with oversight by MPCA, or that the findings were incorporated in and adopted by the RI that was ultimately approved by MPCA. Defendants' argument that the

38

activities were motivated by the needs of the gravel mining EIS rather than the RI is simply not a valid argument under CERCLA.

It is undisputed that the RI expressly identifies and incorporates these challenged studies. ECF No. 204-14, at UMP024925-UMP024936. The MPCA approved these studies and acknowledged that they were reasonable and necessary in response to the release or threatened release of hazardous substances. ECF No. 204-16. Furthermore, the University's expert has concluded that these actions were "necessary to assess whether the past Site activities resulted in a release of hazardous substances to the environment and the threat those pose to human health and/or the environment." ECF No. 205-1, at 18. The Government offers no evidence to the contrary.

### B. Double Recovery

The Government also moves to preclude the University from recovering $732,695.84 in costs, which it claims the University has already been reimbursed for by its mining lessee, Dakota Aggregates. The court previously denied an earlier motion in which Government argued the University was seeking double recovery but noted that the Government would be allowed to provide further argument if it could identify evidence demonstrating that the University has recovered more than what it expended in environmental cleanup. See ECF No. 124, at 19. The Government

has not done so, and instead offers the same legal argument that focuses on semantics rather than the evidentiary record.

The facts demonstrate that the University has not been compensated for its environmental response costs by Dakota Aggregates; rather, Dakota Aggregates advanced certain gravel production royalties to the University subject to a complete — and now fully satisfied — repayment obligation. There is no question that the University has borne the full cost of the response costs at issue, which negates the Government's double-recovery argument.

The Government has not identified how the University has been "compensated" for its removal costs when the University was obligated to repay 100% of the money advanced by Dakota Aggregates. Although it is true that CERCLA's prohibition on double recovery can bar recovery of costs that were addressed in private party settlements, the Mining Lease is not a private party settlement allocating legal responsibility for response costs—Dakota Aggregates was not a PRP that shared any fault for a release or threatened release at the Site. See Cooper Indus., LLC v. Spectrum Brands, Inc., 412 F. Supp. 3d 1082, 1109 (E.D. Mo. 2019) (analyzing the impact of private party settlements on allocation in the context of comparative fault). Instead, Dakota Aggregates agreed to advance mining royalties to the University in order to help facilitate the commencement of mining activities, which it knew

could not begin until the environmental investigations were complete.

Courts faced with similar issues have concluded that charges that help defray the impact of response costs do not need to be offset against CERCLA recovery. For example, in Carson Harbor Vill., Ltd. v. Unocal Corp., 287 F. Supp. 2d 1118 (C.D. Cal. 2003) aff'd sub nom., Carson Harbor Village Ltd. v. City of Los Angeles, 433 F. 3d 1260 (9th Cir. 2006), the court rejected an argument that a rent increase—which was granted in part to help defray the plaintiff's remediation expenses—was "compensation for removal costs" that should be credited against the plaintiff's cost recovery claim. 287 F. Supp. 2d at 1181-82. Indeed, unlike Carson Harbor, where the plaintiff unquestionably obtained a profit from the rent increase that was in addition to the response costs recovered in litigation, the University has not received any windfall payments that would leave it with more money than it paid in response costs.

The absence of any windfall also refutes the Government's argument that a "broader equitable double recovery theory" should apply to this case. ECF No. 189, at 10. Equitable theories of double recovery are focused on the notion that a plaintiff should not be able to recover "more than the response costs he paid out of pocket." Lockheed Martin Corp. v. United States, 35 F. Supp. 3d 92, 154 (D.D.C. 2014), aff'd, 833 F.3d 225 (D.C. Cir. 2016).

The University is not seeking to recover more than it has paid out of pocket—the University seeks $732,695.84 that it undisputedly paid to Barr. The advance of those costs by Dakota Aggregates as credits against production royalties has been paid back in full, so the University still bears the responsibility for the full payment it made to Barr. In short, the University has not received, and will not receive, a windfall through recovering these response costs in this litigation.

C.   **Additional Costs**

Finally, defendants argue that some unspecified amount of the University's costs may be unrecoverable because it was related to litigation rather than environmental investigation.

The United States Supreme Court held in Key Tronic Corp. v. United States, 511 U.S. 809 (1994), that a private party bringing an action to recover a share of clean-up costs against other responsible parties generally cannot recover the costs of that litigation as "response costs" in a CERCLA action because it is not a "necessary cost of response." 511 U.S. at 819. Key Tronic did not broadly prohibit recovery of "litigation support," as Defendants suggest, but instead looked specifically at whether attorneys' fees could be recovered as "response costs." The Court made clear that the relevant question was not whether a cost was tied to litigation or not, but rather, whether a cost was "closely tied to the actual cleanup" and "served a statutory purpose apart

from the reallocation of costs." 511 U.S. at 820. Even attorney's fees were recoverable, the Court concluded, if they were incurred to "significantly benefit[] the entire cleanup effort." Id.

Defendants have failed to identify any specific cost that it claims was related to litigation support and not "closely tied to the actual cleanup" or investigation of the Site.

Defendants have not identified any invoice submitted by the University that is purportedly litigation cost, let alone a cost that is not related to the cleanup, nor have they identified any basis by which the Court could conclude that any of the invoices include prohibited litigation expenses. This is insufficient to establish a material dispute of fact at summary judgment because a party "must do more than simply show that there is some metaphysical doubt as to the material facts," and must instead come forward with "specific facts showing that there is a genuine issue for trial." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

The University submitted with this motion all invoices for which it seeks partial summary judgment. ECF Nos. 206, 206-1-5. All of these invoices involve studies that were conducted between 2002 and 2016, comprising the RI. Litigation did not begin until August 2017, and none of the claimed costs were incurred after that date.

43

Defendants claim that there is evidence some of the costs may be litigation expenses because the University has withheld from production, on the basis of work product privilege, a number of draft reports and communications between its environmental contractors and its attorneys. In a previous order, this court determined that the University properly withheld these communications because they were prepared in anticipation of litigation. ECF No. 176.

Defendants' argument improperly conflates the issue of work product privilege for documents prepared in anticipation of litigation and the question of whether work can both support litigation and also be "closely tied to the actual cleanup" and "served a statutory purpose apart from the reallocation of costs." Key Tronic, 511 U.S. at 820.

This court's previous decision already noted that there were many decisions confirming that an environmental contractor's work could be aimed at complying with environmental regulators while also protected as work product created in anticipation of litigation. ECF No. 176, at 37-38. Defendants have offered no authority to suggest that costs were unrecoverable under CERCLA simply because it was done in anticipation of litigation. Indeed, the Eighth Circuit has counselled the opposite in Johnson, cited above, noting that it "rejected the argument that cleanup costs

prompted by the threat of litigation were not caused by a release, but were unrecoverable litigation expenses."  226 F.3d at 963.

The fact the University anticipated litigation since 2001 does not make its costs to perform the RI unrecoverable under CERCLA. Defendants have cited no authority to the contrary.

## VI.  The Government's Claimed Response Costs

The Government claims it has incurred response costs in three separate categories: $779,927.27 in internal USACE costs from 2000–2021; $812,276.45 in contractor costs; and  $90,249.40 in attorney's fees.  The Government has failed to establish that these amounts are recoverable response costs.

### A.  USACE's Internal Costs

The Government's costs were not incurred "in response" to the release of hazardous substances at the Site, as required for cost recovery under CERCLA.  From the late 1990s, when USACE determined that GOW is a "PRP project" site, its activities focused solely on minimizing the Government's involvement.  USACE's actions and the associated expenses were not taken in response to a release pursuant to CERCLA, but rather, to justify not taking actions under FUDS Policy in response to the release.

Indeed, it is difficult to see how USACE's efforts can be considered a "response" to the release or threatened release at the Site when it informed the MPCA of that it would refuse to help in the preparation of the RI, refused to participate in public

meetings concerning the RI, and offered a qualified refusal to meet with MPCA regarding to the RI. Rather, unilaterally limiting its involvement to a "technical role ... offering suggestions and recommendations, but not to making decisions or implementing actions."  ECF No. 204-10.

When USACE did provide comments to the RI, they were not directed at technical support, but were instead "focus[ed] on determining levels of responsibility for releases instead of on technical aspects of the ... [2017 RI] Report."  ECF No. 204-17.

In addition, USACE's methods for tracking its internal labor costs lack specificity, and rely almost entirely on an *ad hoc* review, conducted many years after the fact, and are therefore facially inconsistent with the NCP.  An attempt to recreate the amount of time spent on certain tasks a decade after the fact is "utterly ludicrous" and not consistent with the accurate accounting requirement under the NCP.  City of Wichita, Kansas v. Trustees of APCO Oil Corp. Liquidating Tr._, 306 F. Supp. 2d 1040, 1096 (D. Kan. 2003).  Estimating the number of hours worked by USACE employees on these tasks "months, years, and almost a decade after the fact is simply too speculative to be considered accurate."  Id.

   **B.   Contractor Costs**

Although the Government did engage environmental contractors to perform some limited investigations of portions of the Site,

these studies were not responses to a release or threatened release at the site but were instead intended to help close out USACE's PRP determination and cut off further costs from being incurred at the Site.

USACE admits that the 2006 PA, which investigated only the 1947 parcel, was conducted as a result of Congressional pressure, not an effort to assist the MPCA in its investigation of the Site. ECF No. 199-8, at 168:4-17.  The stated purpose of the 1947 PA was simply to evaluate USACE's potential liability, i.e., "to determine whether the United States government has any potential responsibility and need to investigate the activities that may have occurred in the past and that may have resulted in HTRW at the site ...."  ECF No. 199-13, at 57:19-24.  This is at odds with the purpose of a remedial PA as set out in the NCP, which states that such an assessment "shall consist of a review of existing information about a release such as information on the pathways of exposure, exposure targets, and source and nature of release ...." 40 C.F.R. § 300.420(b)(2).

There is no way USACE's 1947 PA could accomplish this statutory purpose, given USACE's refusal to evaluate the 1948 parcel, which was "the industrial area" where GOW's production activities occurred.  ECF No. 199-13, at 62:3-14.  Instead, USACE attempted to pick and choose the investigation areas—and activities—so it could close out its FUDS Program involvement at

GOW. USACE continued to reject MPCA's request to conduct a full investigation of GOW. ECF No. 203-7.

USACE performed the Limited Steam Plant PA and the FSI, both in March 2009, and the ESI in December 2009, to "support the Department of the Army (DA) with PRP determination and closeout of eligible areas in a timely manner." ECF No. 203-10. Again, these efforts do not align with the requirements of the NCP for preliminary assessments nor site assessments. Site investigations are performed to collect additional site information that may build on the information contained in the remedial preliminary assessment, 40 C.F.R. § 300.420(c)(2). Both the FSI and ESI, which addressed areas from the 1947 parcel and the 26.7-acre Steam Plant parcel carried forward from the respective preliminary assessments, fail to provide the wholistic data MPCA sought, as evidenced by MPCA's continuing requests for investigation of the entire GOW site. ECF Nos. 203-9, 203-11. On USACE's draft FSI, MPCA also took exception to USACE's conclusion that no further investigation was necessary at the subject areas addressed in the FSI. Id.; 40 C.F.R. § 300.420(c)(5)(v).

## C. Attorney's Fees

The Government claims it has incurred $90,249.40 in "enforcement" costs, which consist exclusively of costs associated with the DOJ's prosecution of this specific cost recovery counterclaim in the present litigation.

In United States v. Dico, the Eighth Circuit determined that the Government, on behalf of the EPA, can recover its enforcement costs pursuant to CERCLA § 107, due to the inclusion of "enforcement activities related" to "response" actions.  266 F.3d 864, 878 (8th Cir. 2001), citing 42 U.S.C. § 9601(25).  The EPA incurred the costs at issue in Dico in the course of its remediation efforts.  Dico, 266 F.3d at 868, 876.  In Dico, the legal fees at issue were incurred during EPA's activities as "the primary enforcer of CERCLA."  United States v. Gurley, 43 F.3d 1188, 1200 (8th Cir. 1994).

USACE is not in an enforcement role at this Site. Not only is the MPCA the lead agency, overseeing USACE FUDS Program investigation and remediation activities in Minnesota, but USACE has expressly declined to assert any jurisdiction over the Site, or over the University or DuPont, to "plan and direct response actions," or, importantly, to "enforce the provisions of" CERCLA. See 42 U.S.C. § 9604(b)(1).  Indeed, USACE has taken every opportunity to disavow itself of any active role at the Site, going so far as to invite the University to sue the government to get any further participation from USACE.  See, e.g., ECF No. 203-25. Although regulatory enforcement costs may be recoverable under CERCLA, "no party—governmental or private—is entitled to litigation costs."  Nu-W. Min. Inc. v. United States, No. 09-431, 2011 WL 2604740, at *4 (D. Idaho June 30, 2011).

49

The Government argues that it is entitled to enforcement costs regardless of its role, citing to United States v. Chrysler Corp., 168 F. Supp. 2d 754, 763 (N.D. Ohio, Sept. 25, 2001) (Chrysler Corp. II) for the proposition that Section 107 does not distinguish between when the government is a PRP and when it is not. But Chrysler Corp. II is a case where EPA was involved as an enforcer and the court expressly declined to distinguish between two separate federal agencies (EPA and the National Park Services) in the same action. That same court made clear in an earlier decision that, "[w]hether all federal PRPs should be entitled to pursue response costs recovery actions under § 107 is not a question this Court need address." United States v. Chrysler Corp., 157 F. Supp. 2d 849, 860 (N.D. Ohio 2001) (Chrysler Corp. I).

Moreover, the issue in this case is not that the Government is a PRP, but simply that it has never held an enforcement role and has specifically declined any further participation in the cleanup at the Site. The recovery of "enforcement costs" is based on a public policy that puts pressure on responsible parties to promptly cleanup hazardous waste sites by imposing on them the financial responsibility for EPA's efforts to enforce the cleanup when the responsible parties failed to act. United States v. Chapman, 146 F.3d 1166, 1175 (9th Cir. 1998). Here, the Government has refused to comply with MPCA's directives and has disclaimed any role in the cleanup. This is not the type of enforcement

50

activity addressed in Chapman.  Indeed, the attorney's fees sought in the Government's counterclaim did not encourage the University to conduct the required cleanup (it is already doing so); rather, they were incurred only after the University was forced to sue the Government and are clearly a response to the University's lawsuit, even if ostensibly segregated from the Government's "defense" costs relating to the University's own CERCLA § 107 claim.

Because USACE has not acted in a CERCLA enforcement capacity at GOW, DOJ's involvement in this matter, likewise, does not seek to enforce any requirement of CERCLA.  DOJ cannot itself enforce the very requirements its client seeks to evade. DOJ's efforts in this action are not to require a recalcitrant party to perform a RI.  For these reasons, the Government is not entitled recover attorney's fees.

### CONCLUSION

Based on the above, **IT IS HEREBY ORDERED that:**

1.   The Government's motions for partial summary judgment [ECF Nos. 188, 193] are denied;

2.   DuPont's joinder motion [ECF No. 208] is likewise denied;

3.   The University's motion for partial summary judgment [ECF No. 201] is granted as set forth below;

4.   The University, the Government, and DuPont are all liable parties under CERCLA, 42 U.S.C. § 9607(a). The University and DuPont are also liable parties under MERLA, Minn. Stat. § 115B.04;

5.   The University has incurred $3,361,215.61 in reasonable and necessary response costs at the Site under CERCLA and MERLA, which will be included in the amounts to be allocated at trial;

6.   Defendants have failed to raise a genuine issue of material fact that any subset of the University's response costs are not recoverable under CERCLA or MERLA;

7.   The University is "the State" for purposes of CERCLA and MERLA, and Defendants have failed to demonstrate that the University's response costs are inconsistent with the NCP;

8.   Defendants have failed to raise a genuine issue of material fact regarding whether the University's cost documentation meets the "accurate accounting" requirement of the NCP;

9.   Defendants have failed to raise a genuine issue of material fact as to the recoverability of that portion of the University's response costs that supported both the RI and the gravel mining EIS;

10.  Defendants have failed to raise a genuine issue of material fact as to whether any portion of the University's claimed response costs are unrecoverable litigation support costs;

11.   Defendants have failed to raise a genuine issue of material fact as to whether the University would receive double recovery of $732,695.84 if partial judgment is entered in its favor on its response cost claim;

12.   The Government has failed to show that it is entitled to recover any response costs related to the Site;

13.   The Government has failed to show that its contractor costs, in the amount of $779,927.27, are recoverable response costs;

14.   The Government has failed to show that its internal labor costs, in the amount of $812,276.45, are recoverable response costs or were accurately accounted for;

15.   The Government has failed to show that the fees incurred in DOJ's prosecution of Government's CERCLA cost recovery claim in the amount of $90,249.40, are recoverable enforcement costs;

16.   The Government has failed to show that it has incurred more than its fair share of costs with respect to the Site, and therefore has not demonstrated for purposes of summary judgment that is entitled to contribution under 42 U.S.C. § 9613(f)(1);

17.   The Government has failed to show that it is entitled to any prejudgment interest, and recoverability of prejudgment interest will be determined at trial;

18.   Allocation between the parties of recoverable past response costs, as well as responsibility for future response costs, will be determined at trial;

19.   The motion to exclude the expert testimony of Wiley R. Wright and Robert M. Zoch [ECF No. 197] is denied as moot;

20.   The motions to exclude the expert testimony of David Heidlauf [ECF Nos. 184, 192] are denied without prejudice and may be raised again, as appropriate, during the bench trial in this matter; and

21.   The motion to correct the record [ECF No. 231] is denied without prejudice and may be raised again, as appropriate, during the bench trial in this matter.


Dated: November 3, 2022

                                    s/David S. Doty
                                    David S. Doty, Judge
                                    United States District Court

54